[Crim. No. 9278. First Dist., Div. One. Dec. 22, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JAMES BOWEN, Defendant and Appellant.

**COUNSEL**

Robert E. Breecker, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Alfred Dovbish, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—Defendant has appealed from a judgment sentencing him to state prison following a jury trial in which he was found guilty of murder in the second degree with five admitted prior convictions. (At an earlier trial a verdict was returned finding defendant guilty of murder in the first degree, but his motion for a new trial was granted.)

Defendant contends: (1) The trial court denied him due process of law in refusing to allow him to interview or depose the victim's 4-year-old son who was an eyewitness to the offense; (2) the court erred in failing to hold a hearing on the constitutionality of defendant's prior felony convictions; (3) the court erred in failing to strike defendant's prior felony convictions; (4) the court erred in denying defendant's motion for a mistrial after the prosecution had referred to the impeaching effect of a prior felony conviction on *voir dire* of the jury; (5) the trial court deprived the defendant of due process of law by failing to hold a hearing to weigh the respective probative value and prejudicial effect of certain demonstrative evidence; and (6) the court erred in failing to properly instruct the jury with respect to the effect of voluntary intoxication.

An examination of these contentions in the light of the record reveals that they are either predicated upon nonexistent postulated facts, or that the principles upon which defendant relies are not applicable to the facts as actually developed in the record. No prejudicial error is found. The judgment must be affirmed.

On April 25, 1969, defendant telephoned the victim, who is referred to in the record as Audrey Gardner or Audrey Neimer, early in the morning. He had known her since 1957 and had dated her steadily since 1965. Admittedly the defendant had engaged in thefts on a regular basis since 1966, and was assisted by the victim in disposing of stolen goods. She told him she was going to Martinez that day to buy lingerie.

Defendant took a bus from his East Oakland home to 30th and San Pablo in Oakland; had breakfast, and then purchased a pint of scotch whiskey at a liquor store across the street. He then proceeded to the victim's home, and when he arrived there at about 8:15 or 8:30 a.m. he had consumed about half of the pint. He and the victim discussed her plans for the day. He gave her $40 which she requested for the purchase of lingerie, and she told him that he could not accompany her to Martinez because the lady from whom the lingerie was to be purchased did not "want to be bothered with any young man." Defendant and the victim came out of the house together. He left the half empty bottle of scotch he had brought.

The victim got into her car and offered to give defendant a ride to his niece's house, but he declined. About that time Raymond Tyler, who had also been seeing the victim,[1] walked up toward her car. The victim joined Tyler and defendant left.

Tyler confirmed that he saw defendant with the victim about 8:30 in front of her house. After defendant left, the victim and her 4-year-old son, Torino, got into Tyler's car and drove Torino to school. Tyler then drove the victim to San Leandro where they went shopping. They returned about noon to pick Torino up at school, and, about one-half hour after 12:15, when they returned to the victim's home, the victim put her son to bed in her bedroom. Tyler stayed at the victim's house until about 4:30 p.m. when he left.

Meanwhile, defendant walked to his niece's house about three blocks away. He talked and had a few drinks with her, and then returned to the victim's house. When he saw that her car was still there he assumed she had left with Tyler. He let himself into the house with his key to see if the victim was in fact home, and, on ascertaining she was not, he left. He went downtown and visited some bars where he drank scotch. He allegedly was feeling "pretty high." He then walked to the Broadway Theatre and entered about noon. There he went to sleep immediately, and did not wake up until after 4 p.m. (He concededly testified at the first trial that he was at the movie house for six hours.)

He testified that he was not completely sober when he left the theater. He walked down San Pablo Avenue, and purchased a half pint of scotch, which he consumed as he walked on to the victim's house.

When he arrived, he rang the bell, and receiving no answer, opened the door with his key. As he walked upstairs the victim was walking out of the bathroom, and the two of them met on the landing. In the living room the victim, in response to defendant's inquiry, told him that she had gone to Martinez with Tyler. They argued over the fact she had refused to take defendant, and went with Tyler, and the victim told him she was through with him.[2] Defendant started to push on her and retorted, "No, that's not the way it is going to be."

---

[1]According to defendant the victim had been seeing Tyler during the year preceding her death. About six weeks prior to her death defendant told her to stop seeing Tyler, but she refused, and reportedly stated, " 'You have your bills to pay and you are not making very much money.' " She told defendant she had a lot of bills to pay and that she was getting some money from Tyler. She allegedly said, " 'You bear with me until I get my insurance money. . . . After that, then I will break off with him.' " Defendant testified he acquiesced.

[2]Defendant described their conversation as follows: "A. Well, I proceeded to ask her, did she go to Martinez, and she said she did. I said, 'How did you go?' and she laughed. I said, 'How did you go up there?' and she said, 'I went there with Ray.'

Then the victim allegedly threatened him by stating, "You keep on bothering me and the same thing is going to happen to you that happened to Lorenzo—same thing is going to happen to you. I am going to get you killed like I got him killed."[3] Defendant replied, "I don't want to talk about it." The victim then reviled defendant as follows: " 'Are you stupid! You are just like Lorenzo. He wanted to be the boss and he was stupid like you.' "

Thereupon defendant slapped her and she ordered him to leave the house. He slapped her again and she picked up the telephone with the comment, "I know the way to get you out of here." He pulled the phone from her and threw it on the floor. She went quickly to the kitchen, returned wielding a brown-handled steak knife, and again ordered him out of the house. Defendant saw the blade of the knife sticking up as the victim began a blow to strike him. He grabbed her, twisted her arm, and took the knife away.

The victim turned and ran into the front bedroom with defendant in pursuit. She went to the window and commenced yelling. Defendant seized her from the rear, pulled her back, and they both fell on the bed where they struggled until the victim threw off defendant, got up and ran out toward the stairs. Defendant pursued her, caught her at the first or second step, and stabbed her until she fell on the stairs. He picked her up and pulled her back upon the landing. He asked her to get up and walk and she replied, "I can't walk."

About this time defendant felt something poking him. Turning around he discovered that Torino was sticking him with a knife, and he took the knife away from the child.

---

I said, 'Well, you told me this morning that you couldn't take no one because the lady don't want to be bothered.' She said, 'Well, I changed my mind.' I said, 'Why did you lie?' She said, 'Well, anyway, I decided not—I come to the conclusion you and I just can't make it.' "

"A. She said she changed her mind and just decided to take him, anyway. Q. Did you say anything? A. I said why did she lie. Q. Did she have an answer for you? A. She said, 'I didn't lie.' She says, 'I just changed my mind. Anyway,' she says, 'I take who I want with me any place I go. You don't tell me what to do.' Q. How did you react to that? A. I got a little bit angry, and I said, 'Well, did you buy the lingerie?' and she said, 'No, I didn't get any.' 'You said you want to buy some lingerie this morning,' and she say— Q. What did she say? A. She told me, she said, 'Well, I didn't get any lingerie.' I said, 'You would take him, but you wouldn't take me.' She said, 'That's right. Anyway, she said, 'I come to the conclusion you and I can't make it any more.' I said, 'Well, Audrey, that was not the way you talked this morning.' She said, 'I am sorry. . . .' "

[3]According to the defendant, one Lorenzo Fambro had been killed by another man just out of the presence of the victim. She told the defendant he was killed in a fight over her affections.

Defendant picked the victim up and took her into the bathroom and laid her on the bath mat. When he was unable to stop her bleeding with a bathtowel, he picked her up and placed her in the bathtub. Meanwhile, Torino repeatedly attempted to enter the bathroom, and defendant kept ordering him to get out.

Defendant considered and rejected the idea of calling the police because he thought they would not believe him because he had a prison record. He found the victim's handbag on the kitchen floor, looked for money, found none, and removed her car keys. He drove the victim's car to his niece's house because he was confused, frustrated and scared, and wanted to talk to someone. She was not home. He then threw away the two knives he had seized from the victim and Torino, and went home to wash up and change his clothes. After doing so, he left to attempt to find his sister who worked at the Presidio in San Francisco. On the way he bought a pint of scotch, and visited a nightclub to ascertain what band was playing there.

Meanwhile, Burnett Hale, an acquaintance of the victim telephoned her house about 5:45 p.m. Torino answered. He called again about 30 or 40 minutes later and Torino again answered. His suspicions aroused, he went to the victim's home and was admitted by Torino. Hale noticed blood in the apartment, went into the bathroom, and found the victim's body. He called for an ambulance and in a few minutes an ambulance and the police arrived.

The victim's daughter also telephoned at about the same time as Hale. She spoke with Torino who sounded slightly upset. Her husband went over to the victim's home and found Torino wearing a blood stained T-shirt, and with blood all over the soles of his bare feet.

Officer Perry of the Oakland Police Department answered the call to the victim's address. He inspected the victim's blood stained apartment, and then went to the defendant's residence. There he found a blood stained bath towel and similarly stained clothing.

An autopsy surgeon testified that the victim's death resulted from shock and hemorrhage from 12 stab wounds, and that he also noted 14 abrasions and contusions on the victim's body.

Defendant's sister testified that he arrived at her place of employment in the cafeteria at the Presidio about 6:30 p.m. The defendant opined he was a "little high," then he told her, "I got rid of Audrey . . . In the bathtub." He stated that he killed Audrey because she mistreated him. The sister knew that defendant had been seeing Audrey since 1965, and she felt that Audrey had been taking advantage of him. Nevertheless, she thought defendant was kidding because he had made similar statements

jokingly in the past, and he subsequently stated that he was going to pick up Audrey later in the evening. She stated that she knew defendant had been drinking before he arrived because of the way he carried himself and because he was calm, in a manner he generally was when under the influence of alcohol. His speech was slightly slurred and he staggered when he walked out of the cafeteria. He told her that he had been drinking earlier that day at both the victim's and his niece's homes. In his sister's opinion, the defendant was not drunk, but he was under the influence of alcohol.

They left the Presidio together and drove to South San Francisco. Later in separate cars they drove to Oakland where he parked the victim's car and went with his sister. The sister recalled that the defendant drank from two separate whiskey bottles in her presence during the evening.

Shortly after 11 p.m. Officer Gillespie of the Oakland Police Department, who had received information about the homicide, and a description of the victim's vehicle over the police radio, located the parked vehicle and kept it under surveillance. He identified the defendant as the person who was transported to the car and entered and drove it off. Before the defendant was brought to a stop he accelerated to 60 miles per hour and ran a red light. At the time of his arrest he cautioned his sister, who had followed him in her car, "Don't say nothing."

Two Oakland police officers testified to a prior incident, November 15, 1968, admitted by the defendant, when in response to a woman's screams they found defendant and Audrey struggling. One officer saw the defendant biting his companion's hand. A steak knife was removed from defendant's grasp, and it was noted that Audrey's hand was bleeding.

Tyler testified that on September 17, 1966, the victim had attacked him with a knife at a service station where he was working; that she tried to stab him, they struggled and she dropped on the floor a brown handled knife, which was similar to that she raised against the defendant on April 25, 1969. This attack was corroborated by another defense witness.

I

Prior to the trial the defendant moved the trial court for an order permitting his counsel to interview informally, or to conditionally examine by deposition, the victim's infant son. The court denied the defendant's motion, and he contends that he was thereby deprived of due process of law and other constitutional rights.

Article I, section 13 of the Constitution of the State of California pro-

vides in part: ". . . The Legislature shall have power to provide for the taking, in the presence of the party accused and his counsel, of depositions of witnesses in criminal cases, other than cases of homicide when there is reason to believe that the witness, from inability or other cause, will not attend at the trial."

This section is implemented by sections 1335-1337 of the Penal Code.[4] It generally has been recognized that right to a deposition in criminal cases did not exist at common law, nor is it a constitutional right. In criminal cases, the right to a deposition is governed by the foregoing constitutional and statutory provisions. (See *Everett* v. *Gordon* (1968) 266 Cal.App.2d 667, 671 [72 Cal.Rptr. 379]; and *Clark* v. *Superior Court* (1961) 190 Cal.App.2d 739, 742 [12 Cal.Rptr. 191].) Defendant contends that the title "Rights of Accused," under which the foregoing constitutional provision is found, demonstrates that the provision is merely a limitation on the prosecution (i.e., no depositions in homicide cases, nor unless there is reason to believe that the witness from inability or other cause will not attend the trial), rather than a grant of power, and that there is an inherent unqualified right for the defendant to take depositions. This contention is rejected. The section guarantees the defendant the right to be present when a deposition is taken, and qualifies the general rule of confrontation of witnesses before the trier of fact (see *Pointer* v. *Texas* (1965) 380 U.S. 400, 407 [13 L.Ed.2d 923, 928, 85 S.Ct. 1065]) with a grant of legislative power to provide otherwise under special circumstances.

■ The defendant insists that in any event he complied with the statutory provisions which grant the defendant the right to have witnesses examined conditionally on his behalf (Pen. Code, § 1335). The motion and supporting affidavit set forth the nature of the offense charged, the state of the proceedings, and the name and address of the witness. (See

---

[4]The Penal Code provides in pertinent part: "Section 1335: When a defendant has been charged with a public offense triable in any court, he in all cases, and the people in cases other than those for which the punishment may be death, may, if the defendant has been fully informed of his right to counsel as provided by law, have witnesses examined conditionally in his or their behalf, as prescribed in this chapter."

"Section 1336: When a material witness for the defendant, or for the people, is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he will be unable to attend the trial, the defendant or the people may apply for an order that the witness be examined conditionally."

"Section 1337: The application must be made upon affidavit stating: 1. The nature of the offense charged; 2. The state of the proceedings in the action; 3. The name and residence of the witness, and that his testimony is material to the defense or the prosecution of the action; 4. That the witness is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he will not be able to attend the trial."

Pen. Code, § 1337, subds. 1, 2 and 3.) With respect to materiality (subd. 3) it was alleged, ". . . said child is the only person who could corroborate defendant's version of the facts surrounding the alleged offense."

The code further requires, "That the witness is about to leave the state, or is so sick or infirm as to afford reasonable ground for apprehending that he will not be able to attend the trial." The motion further alleged. ". . . there is reasonable cause to believe that Torino Gardner, due to his age and the nature of the subject matter, would be unable to testify before a jury and in an adversary atmosphere, or, if testimony were begun, that he might 'freeze' and become unable to sit through the remainder of direct or cross examination due to the stress of exposure to a jury and the formality of the adversary proceeding." The People assert that those allegations do not meet the statutory test. It was completely conjectural until the infant was called as a witness whether he would be found competent to testify (see Evid. Code, §§ 700-702), and if so whether his ability to testify would be impaired as feared by the defendant. (Pen. Code, § 1041.) The allegations do not meet the letter of the statute.

There are several other factors which indicate that the denial of the motion, if error, was not prejudicial. The child was not called as a witness by the prosecution, so the defendant was not prejudiced in the sense that he was surprised by any testimony elicited from the infant. Secondly, the verdict of second degree murder disposed of any theory of first degree murder predicated upon lying in wait or premeditation and it was unnecessary to have the testimony of the boy to rebut any such inference. Thirdly, defendant could have subpoenaed the infant as a witness at the trial, but no attempt was made to do so. Finally, although defendant insists that he was entitled to discover whether the child could corroborate that the victim initiated the violence by attacking him, the record does not reveal that Torino was present and a percipient witness prior to the time defendant was engaged in the final fatal assault at the head of the stairs.[5] Moreover,

---

[5]In the motion defendant's attorney alleges on information and belief: "That the only eyewitness to the alleged offense other than the defendant was a small boy whom the victim was raising, Torino Gardner, and that said child lived in the same apartment as the victim . . . . [¶] That said child was four years old at the time of the alleged offense, was personally acquainted with the defendant, and was in a position [to] perceive what was occurring. . . . [¶] That said child is the only person that could corroborate defendant's version of the facts surrounding the alleged offense." Obviously Torino and defendant are the only ones who know where Torino was during the acts in question. There is no declaration by defendant. The attorney relies on the defendant's testimony from the earlier trial, which, as in the current trial, first brings Torino on the scene when defendant was attacking the victim with a knife at the head of the stairs. The assertion that Torino witnessed any attack made by the victim on the defendant is pure speculation.

The defendant's objection to any testimony concerning what Torino said on the telephone concerning the occurrence to Mr. Hale or to the victim's daughter was

it is clear that the jury rejected any theory of self defense, or manslaughter, because of heat of passion, because defendant under his own version of the occurrence left a position of safety in the living room and pursued the victim into the bedroom and later into the hall.

■ Defendant acknowledges that in *Clark* v. *Superior Court, supra,* the court held that depositions were not available as a means of discovery in criminal actions (190 Cal.App.2d at pp. 742-743). He urges that the history of the provisions concerning depositions and discovery requires that the early decision be disregarded. He notes that the provisions in the Penal Code (§ § 1335-1341) were adopted in 1872 at the same time as section 2019 of the Code of Civil Procedure. He points out that the scope of the use of depositions for discovery in civil proceedings was greatly expanded by judicial decisions (see *McClatchy Newspapers* v. *Superior Court* (1945) 26 Cal.2d 386, 393-394 [159 P.2d 944]), before the Legislature acted in similar vein by amending section 2019 in 1957. He asserts that therefore a more liberal interpretation should be given the constitutional and statutory provisions relating to depositions in criminal proceedings so that depositions can be used for discovery. Whatever merit there may be to defendant's argument, it is yet a matter to be addressed to the Legislature or court of last resort. The interpretation of the Constitution and statutes first set forth herein, and found in *Clark* v. *Superior Court, supra,* and *Everett* v. *Gordon, supra,* appears sound.

■ Defendant's contention that his right under the Sixth Amendment of the United States Constitution to "enjoy the right . . . to have compulsory process for obtaining witnesses in his favor" has been abrogated is not tenable. He was at all times entitled to subpoena Torino if he was so advised. His argument that such right is valueless if he cannot interview the potential witness is discussed below.

■ It is true, as noted by defendant, that the decisions have carefully protected the right of the defendant to discover evidentiary matters in the hands of the prosecution. In *People* v. *Riser* (1956) 47 Cal.2d 566 [305 P.2d 1] [app. dism. 358 U.S. 646 (3 L.Ed.2d 568, 79 S.Ct. 537), overruled on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631 (36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)] the court stated, "Absent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues

---

sustained. The prosecution offered to prove that the child said his mother was in the bathtub, and indicated the evidence had been received at a prior trial. The defendant failed to determine whether either of these witnesses heard Torino declare that he knew more about the events leading to his mother's death.

in the case, . . ." (47 Cal.2d at p. 586.) Similar concern was voiced in *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], although relief was denied on the facts. The court said: "Our position does not reflect 'a swing of the pendulum' . . . away from our fundamental concern that an accused be provided with a maximum of information that may illumine his case. . . . 'A showing, however, that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, *if it appears reasonable that such knowledge will assist him in preparing his defense. . . .'*" (64 Cal.2d at p. 167.)

■ In this case the boy Torino was in the custody of the victim's daughter at the time of trial. Defendant alleged that despite several attempts to interview the boy, his custodian refused defendant's counsel permission to conduct such an interview.

This, of course, is not a showing that the prosecution was withholding information to which defendant was entitled. (Cf. *Walker* v. *Superior Court* (1957) 155 Cal.App.2d 134, 139-140 [317 P.2d 130].)

It would appear that under the circumstances of this case, the court might well have issued a subpoena for the child's attendance at a session in chambers where his competency as a witness and knowledge of the events which transpired could be explored under the protection of the court. The views in the foregoing cases require no less. Nevertheless, because of the lack of prejudice, as reviewed above, the abuse of discretion, if any, by the court does not require a reversal.

## II

The information charged defendant with the following prior convictions in Alameda County: (1) forgery, April 7, 1959; (2) assault with a deadly weapon, July 5, 1960; (3) and (4) two charges of forgery March 3, 1961; and (5) fictitious checks, March 3, 1961. When the case was assigned for trial, but before the commencement of the impanelment of the jury the defendant moved to strike the five prior convictions. Defendant's counsel made the following offer of proof: "If Mr. Bowen were called by the defense to testify on this issue, he would testify that he was represented by counsel at the prior convictions, but that he was not advised prior to pleading guilty of these—on these former occasions. He was not advised by his counsel that he had a right to a jury trial, that he had a right to confront and cross-examine witnesses, and that he — and that he was relinquishing his right under the Fifth Amendment to remain silent."

The court pointed out that the motion was not timely because all preliminary matters were supposed to have been disposed of prior to trial. (The amended information containing the five priors was filed December 18, 1969; the defendant was first tried in January 1970,[6] he was granted a new trial February 18, 1970; the discovery motion reviewed above was interposed on May 4, 1970, and was heard on May 6 and May 8, at which time the case was continued to May 11 for trial, and on that date it was assigned out for that purpose.) The court further noted that it had, on its own motion, reviewed the files in the three proceedings giving rise to the prior convictions and ascertained that defendant was represented by counsel throughout each proceeding. It thereupon denied the motion to strike.

Defendant then moved for a continuance of the trial for the purpose of having a hearing on the issues raised by his offer of proof. The court then ruled: "The motion as made by Counsel . . . is denied . . . . I will give Counsel the opportunity . . . [to] show me further bases to strike the priors during the course of . . . trial, . . . which would indicate that a further hearing is necessary . . . I . . . will grant a motion to strike, on a proper showing. But this will have to be supported by affidavit and by—further than the offer of proof given this far. . . ." He later reiterated, ". . . If you can show me good cause during the course of the trial why they should be stricken, by the proper evidence, I will reconsider the same."

Defendant's counsel then made it clear that the defendant was reserving all of his constitutional objections to the charged prior convictions, but did advise his client to admit that the convictions had occurred. Thereupon, the defendant was rearraigned and admitted the five charged convictions.

At a session in chambers to discuss another legal point which arose in connection with the questioning of the first juror, defendant's counsel announced that he did not intend to present any more evidence with respect to the motion to strike the prior convictions.

Subsequently, before the defendant took the stand, an objection was voiced with respect to the use of a prior conviction of assault with a deadly weapon to impeach credibility. The court's denial of defendant's motion to so restrict the cross-examination of defendant is discussed below. This

---

[6]Records of the prior proceedings which have been incorporated in the record of the second trial reveal that on January 2, 1970, the defendant was arraigned on the five prior convictions out of the presence of the jury. The court announced that he had theretofore stood mute as to the priors, and a denial had been entered. On his rearraignment he admitted the priors unqualifiedly. The defendant was represented by a different attorney at the prior trial.

objection was reviewed and overruled at the time of defendant's cross-examination. No objection was inteposed to the use of the other prior convictions for impeachment purposes, and the defendant unqualifiedly acknowledged that he had been so convicted.

"Where a prior conviction is constitutionally invalid because the accused was deprived of his Sixth Amendment right to counsel or did not effectively waive it, utilization of the conviction in a subsequent prosecution to support his guilt, enhance his punishment, or impeach his testimonial credibility, is constitutional error. (*Burgett* v. *Texas* (1967) 389 U.S. 109, 114-116 . . .; *People* v. *Coffey* (1967) 67 Cal.2d 204, 218-219 . . . .)" (*People* v. *Newton* (1970) 8 Cal.App.3d 359, 386 [87 Cal. Rptr. 394].)

The People acknowledge the rule but suggest that the defendant waived the right to attack his prior convictions because he failed to raise the constitutional point when cross-examined. Section 1025 of the Penal Code provides in part, ". . . If [the defendant] answers that he has [suffered such previous conviction], his answer must be entered in the minutes of the court, and *must,* unless withdrawn by consent of the court, *be conclusive of the fact of his having suffered such previous conviction* in all subsequent proceedings. . . ." (Italics added. See *People* v. *Tahtinen* (1958) 50 Cal.2d 127, 134-135 [323 P.2d 442] [cert. den. 358 U.S. 853 (3 L.Ed.2d 88, 79 S.Ct. 85)].) Reliance on the emphasized language can only relate to the proceedings on arraignment and plea. It is clear that at that time the defendant only entered a conditional admission and did not waive his right to assert constitutional infirmities in the prior convictions. The failure to renew the objection, or offer further evidence on the point, should not be deemed a waiver of the rights reserved in connection with the original objection. Such failure, however, does preclude defendant from relying on any matters other than as set forth in his offer of proof.

In *People* v. *Coffey* (1967) 67 Cal.2d 204 [60 Cal.Rptr. 457, 430 P.2d 15], the procedure to raise such a constitutional objection was delineated as follows: "*First,* when a defendant, whether by motion to strike the prior conviction or convictions on constitutional grounds, or by denial of such prior conviction or convictions on constitutional grounds at the time of entering his plea to the same, raises the issue for determination, the court shall, prior to trial, hold a hearing outside the presence of the jury in order to determine the constitutional validity of the charged prior or priors in issue. *Second,* in the course of such hearing the prosecutor shall first have the burden of producing evidence of the prior conviction sufficient to justify a finding that defendant 'has suffered such previous conviction.' (Pen. Code, § 1025.) *Third,* when this prima facie showing has been made, the defend-

ant shall thereupon have the burden of producing evidence that his constitutional right to counsel was infringed in the prior proceeding at issue. *Fourth,* if defendant bears this burden, the prosecution shall have the right to produce evidence in rebuttal. *Fifth,* the court shall make a finding on the basis of the evidence thus produced and shall strike from the accusatory pleading any prior conviction found to be constitutionally invalid." (67 Cal.2d at pp. 217-218.) This suggests, as the orderly administration of criminal justice requires, that the objection be made at the earliest opportunity, and not be delayed until the court is prepared to empanel the jury. Nevertheless, in *People* v. *Curtis* (1969) 70 Cal.2d 347 [74 Cal.Rptr. 713, 450 P.2d 33], the court encouraged dilatoriness by observing, "That the issue arises during and not before trial, so long as the objection is asserted before the case is submitted to the jury, appears to be without significance." (70 Cal.2d at pp. 360-361; and see *People* v. *Newton,* 8 Cal.App.3d 359, 386 [87 Cal.Rptr. 394].) In *Curtis* the defendant did not raise the question of inadequate representation until he testified and admitted the prior, even though the prior was charged and apparently denied and put in issue. So here defendant was presumably within his rights in waiting through several arraignments and one prior trial before attempting to raise the constitutional objections to his priors.

■ The crux of the question is whether defendant has set forth "allegations which, if true, would render the prior conviction devoid of constitutional support." (*People* v. *Coffey, supra,* 67 Cal.2d at p. 215.) There the court quoted with approval from *People* v. *Merriam* (1967) 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161], as follows: "One seeking to challenge prior convictions charged against him may do so only through a clear allegation to the effect that, in the proceedings leading to the prior conviction under attack, he *neither was represented by counsel nor waived the right to be so represented.*" (Italics in original.)

In *Kercheval* v. *United States* (1927) 274 U.S. 220 [71 L.Ed. 1009, 47 S.Ct. 582], the court observed, "Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. When one so pleads he may be held bound. [Citation.] But, on timely application, the court will vacate a plea of guilty shown to have been unfairly obtained or given through ignorance, fear or inadvertence." (274 U.S. at pp. 223-224 [71 L.Ed. at p. 1012].) "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. [Citation.] Second, is the right to trial by jury. [Citation.] Third, is the right to confront one's

accusers. [Citation.]" (*Boykin* v. *Alabama* (1968) 395 U.S. 238, 243 [23 L.Ed.2d 274, 279, 89 S.Ct. 1709].) In *Boykin,* the court held that it was error for the trial judge to accept petitioner's guilty plea without an affirmative showing in the record that it was intelligent and voluntary and made with a waiver of the foregoing rights. *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] reviewed the requirements of *Boykin* and concluded that the law of this state, prior to the decision in *Boykin,* was properly summarized by a commentator as follows: " 'The court must inform the defendant of his right to counsel, but need not inform him of the consequences of his plea; that is the responsibility of his counsel, not the court.' " (Witkin, Cal. Criminal Procedure (1963) § 253, p. 234, as quoted in 1 Cal.3d at p. 129.) The court concluded, ". . . we believe *Boykin* v. *Alabama* and the procedures adopted herein must be given prospective application only, i.e., to those cases in which pleas were entered subsequent to the effective date of that decision. As petitioner pleaded guilty well prior to that date, and we have determined his plea to be voluntary and in conformity with then prevailing California law and practice, petitioner's procedural attack on his plea must fail." (1 Cal.3d at p. 135.)

██ Defendant, in effect, is urging inadequacy of counsel, because his counsel did not advise him "that he had a right to a jury trial, that he had a right to confront and cross-examine witnesses . . . and that he was relinquishing his right under the Fifth Amendment to remain silent." ██ In applying *People* v. *Coffey, supra,* and the cases (*In re Woods* (1966) 64 Cal.2d 3 [48 Cal.Rptr. 689, 409 P.2d 913]; *In re Luce* (1966) 64 Cal.2d 11 [48 Cal.Rptr. 694, 409 P.2d 918]; and *In re Tucker* (1966) 64 Cal.2d 15 [48 Cal.Rptr. 697, 409 P.2d 921]) which established that an earlier conviction could be collaterally attacked because the defendant had been denied the assistance of counsel, the courts have recognized that a token presence of counsel will not satisfy constitutional requirements (*In re Caffey* (1968) 68 Cal.2d 762, 771-772 [69 Cal.Rptr. 93, 441 P.2d 933]), and that inadequate representation by counsel will furnish constitutional grounds to set aside the prior conviction (*People* v. *Curtis, supra,* 70 Cal.2d 347, 359-361). It is no answer to say that since *Boykin* is not retroactive there is no error in counsel's failure to advise his client of his rights because, by hypothesis, the court's failure to so advise the defendant is presumptively cured by the advice of counsel (see *In re Tahl, supra,* 1 Cal.3d at p. 129). When the presumption is rebutted, the cure dissolves.

██ Nevertheless, the ruling of the trial court must be upheld in this action. Defendant has not alleged facts which show that there was any denial of an opportunity for the defendant to confer with his counsel in any of the prior proceedings, or that any of the appointments was a sham and nothing more than a formal compliance with the constitutional requirement

that he be given the assistance of counsel. (Cf. *In re Caffey, supra,* 68 Cal. 2d at pp. 771-772.) Nor does it appear that appointed counsel in any of the prior actions failed to investigate carefully all defenses of fact and of law that might have been awardable to the defendant, or withdraw any crucial defense from the case. (Cf. *In re Williams* (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984].)

Defendant, although given an opportunity to do so, studiously avoided by offer of proof or affidavit, any claims that *he* himself was ignorant of his rights at the time he entered his prior pleas.[7] From all that appears he could have manifested such knowledge to his counsel, thereby making such advice superfluous, or he may have been properly instructed by the trial court. The constitutional question is not what his counsel told him, but whether his pleas were intelligent and voluntary. He did not allege that they were not. Turning to the procedure suggested in *Coffey* (67 Cal.2d at p. 217), the People were relieved of making out a prima facie showing that the defendant had suffered the previous convictions, because the court had taken judicial notice of its own records. The defendant thereupon had the burden of producing evidence that his constitutional right to counsel was infringed in the prior proceedings. As noted above, the allegations in the offer of proof were insufficient. The court properly denied further hearing, and defendant's motion for a continuance. (See *People* v. *Witt* (1971) 15 Cal.App.3d 6, 11-15 [92 Cal.Rptr. 770]; and *People* v. *Newton, supra,* 8 Cal.App.3d 359, 387.)

## III

 Defendant's attack on the court's failure to strike his prior felony convictions, with one exception, is dependent on his contention that the court erred in failing to hold a hearing, and in failing to determine that the convictions were obtained in an unconstitutional manner. As noted above, if the evidence produced by defendant warranted such a conclusion the prior convictions could not have been used to enhance his punishment, or to impeach him. (See *Burgett* v. *Texas, supra,* 389 U.S. 109, 115 [19 L.Ed. 2d 319, 325, 88 S.Ct. 258]; *People* v. *Coffey, supra,* 67 Cal.2d 204, 218-219; *Evidentiary Use of Constitutionally Defective Prior Convictions* (1968) 68 Colum. L.Rev. 1168; Comment, *Use of Bad Character and Prior Convictions to Impeach a Defendant-Witness* (1965) 34 Fordham L.Rev. 107; and Note, *Other Crimes Evidence at Trial* (1961) 70 Yale L.J. 763.) Here the prior convictions were used to impeach the defendant. They were referred to as impeaching in the prosecutor's argument to the

---

[7]It is assumed that the prior convictions were each found as a result of a plea of guilty, although, as pointed out by the People, defendant's offer of proof is ambiguous on this score.

jury. The jury was instructed substantially as set forth in CALJIC (3d ed. 1970) No. 2.20 which includes "prior conviction of a felony" as a matter to be considered in determining the credibility of a witness. (See Evid. Code, § 788.) The jurors were also instructed, at the request of defendant, as set forth in CALJIC No. 2.23: "The fact that a witness has been convicted of a felony, if such be the fact, may be considered by you only for the purpose of determining the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness' credibility. It is one of the circumstances that you may take into consideration in weighing the testimony of such a witness." (Cf. Note, *Procedural Protection of the Criminal Defendant* (1964) 78 Harv. L.Rev. 426, 441; and Note, *The Limiting Instruction* (1966) 51 Minn. L.Rev. 264.) Defendant's general attack falls because he failed to make an offer of proof which entitled him to a further hearing on the constitutional issue.

█ There remains for consideration alleged error in overruling defendant's objection to the use of a prior conviction of assault with a deadly weapon for impeachment. He contends that the use of a conviction of that offense bears no relationship to credibility and therefore should not be used for impeachment purposes. In *Luck* v. *United States* (1965) 348 F.2d 763 [121 App.D.C. 151], the court held that the provisions of the District of Columbia Code (14 D.C. Code (1961) § 305) which read that the witness' conviction of a crime "may be given in evidence to affect his credit as a witness . . ." was permissive only. The court recognized that there might be cases in which "the prejudicial effect of impeachment far outweighs the relevance of the prior conviction to the issue of credibility." (348 F.2d at p. 768.) In *Brown* v. *United States* (1966) 370 F.2d 242 [125 App. D.C. 220], the court concluded that it was an abuse of discretion to deny the defendant's motion to exclude a prior conviction of assault with a dangerous weapon in a case in which the defendant was charged with assault on a police officer. The court concluded, "This is a classic illustration of a case in which 'the prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility.' " (370 F.2d at p. 245.)

Section 11 of the Evidence Code states that "may" is permissive. Defendant urges that, therefore, there is no requirement that the prior conviction be admitted in this state, where the apt language in Evidence Code section 788 reads, "For the purpose of attacking the credibility of a witness, it *may* be shown . . . that he has been convicted of a felony. . . ." (Italics added.) His argument has been frequently reiterated and just as often has fallen on deaf ears.

In *People* v. *Kelly* (1968) 261 Cal.App.2d 708 [68 Cal.Rptr. 337], the defendant claimed an abuse of discretion. The court referred to the legis-

lative history of section 788 which showed that the Legislature had rejected the California Law Revision Committee proposal that impeachment be limited to a conviction of a crime in which dishonesty or a false statement was an essential element. (261 Cal.App.2d at pp. 712-713. See also *People* v. *Stewart* (1966) 240 Cal.App.2d 1, 7 and fns. 1 and 2 [50 Cal.Rptr. 26] [hg. den.]; and *People* v. *Grant* (1970) 11 Cal.App.3d 687, 691, fn. 1 [89 Cal.Rptr. 784].) The court concluded, ". . . the trial court did not err or abuse its discretion in receiving this evidence." (*Id.* at p. 713.)

In *People* v. *Romero* (1969) 272 Cal.App.2d 39 [77 Cal.Rptr. 175] [hearing in Supreme Court denied], the court rejected the contention that the trial court had discretion under the provisions of section 352 of the Evidence Code[8] to exclude use of the prior conviction for impeachment when it would cause undue prejudice. The court went further than the *Kelly* court and stated, ". . . we conclude that there is no discretion in the trial court and its ruling was proper. The rule in this state is now (§ 788, Evid. Code) and always has been that any felony conviction is admissible to impeach the credibility of defendant if he takes the stand. (*People* v. *Stewart,* 240 Cal.App.2d 1, 7 . . . .)" (272 Cal.App.2d at p. 45.) The court expressly rejected the District of Columbia doctrine which defendant has advanced in this case. (*Id.,* p. 46.)

*Romero* was followed without comment in *People* v. *Sneed* (1970) 8 Cal.App.3d 963 [88 Cal.Rptr. 32]. There the court expressly held that the trial court was under no duty to advise the defendant, as a prospective witness, whether it would exercise any discretion to disallow potential impeachment. (8 Cal.App.3d at p. 966. See also *People* v. *Stewart* (1970) 11 Cal. App.3d 242, 248 [89 Cal.Rptr. 707] [hg. den.].) In *People* v. *Grant, supra,* the court rejected the contention that a prior conviction predicated on a plea of guilty should be excluded because the plea demonstrated the defendant's veracity.

In *People* v. *House* (1970) 12 Cal.App.3d 756 [90 Cal.Rptr. 831], *Romero* and *Kelly* were reviewed and followed (12 Cal.App.3d at pp. 762-763). Despite a thoughtful, penetrating and critical concurring opinion, which urged the application of the discretionary test of section 352 to the use of a prior conviction for impeachment (*id.* at pp. 768-774), the Supreme Court denied a hearing. It is, therefore, concluded that the trial court properly rejected defendant's attempt to exclude impeachment by his prior conviction of assault with a deadly weapon.

---

[8]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

## IV

Defendant's next contention is also related to the question of impeachment by prior conviction of a felony. During his *voir dire* of the second prospective juror defendant's counsel pointed out that defendant had a choice as to whether he would take the stand or rely on the failure of the prosecution to carry its burden of proof. He then asked the prospective juror, ". . . if he were advised to take the witness stand and he did so, would you give his testimony any less weight, because he is the defendant in this case, than you would give the testimony of any other witness?" In the course of his interrogation he subsequently stated, "Let me put it in another form. The Judge will instruct you as to several rules that you can apply in determining the credibility of a witness. Credibility simply means the accuracy or how close that witness can come to telling you the truth. And the Judge will tell you that you can look at things like the extent and ability of the witness to perceive what is going on, any motive or bias that he has in the case. There are about eleven factors altogether. There are quite a few of them. Would you use the same rules for all witnesses?"

In his examination of the third prospective juror the prosecutor stated, "Now, you have heard [defense counsel] list certain factors that his Honor will tell you at the conclusion of this case that you will take into consideration in ascertaining the credibility of a witness. He mentioned some of them being that you can observe the demeanor of a witness on the stand, any interest in the outcome of the case he may have, any prejudice or bias. His Honor will also instruct you that you can take into consideration and determine the credibility of a witness whether a person has been convicted of a felony in the past. If his Honor instructs you that you can consider it and tells you for what reason you can consider it, would you follow his instructions along those lines?" Defendant objected to the question and asked for an assignment of misconduct. The court overruled the objection without any admonition to the prosecutor or to the jury.

Thereafter, in examining the fourth prospective juror counsel for the defendant asked, "If you were to learn during the course of the trial that Mr. Bowen had been convicted of felonies in the past—I believe the most recent was 1961—would you automatically assume that anything he told you about what happened in 1969 concerning this case is automatically false?" This was followed by, "As the Court will—as Mr. Johnson mentioned, the Court will give you an instruction upon the credibility of witnesses, and one of the things that the Court will tell you that you may consider as one factor in determining the credibility of a witness, whether or not he's ever been convicted of a felony. Now, felony is a crime, so any witness who gets on the stand, whether he is called by the prosecution

or defense, if he's been convicted of a felony, the attorney may inquire about it, and if you learn that he's been convicted of a felony, then when you go in the jury room you can consider that in determining whether the witness was—you can consider it in determining the credibility of that witness, the approximation of that witness's testimony to the truth. Now, so it gives you a factor that you may consider. My question is this: Do you believe if a man has been convicted of a crime in the past that automatically, if he stands before you in another case, he is lying to you?"

At the commencement of proceedings on the second day of trial, after 12 jurors had been examined on *voir dire* and 2 excused for cause and 1 by stipulation on the preceding day, defendant made a motion for a mistrial on the ground that the prosecutor, by adverting to the use of a prior conviction of felony as bearing on the credibility of a witness, had, in effect, improperly brought before the jury that defendant had suffered a prior conviction. The court checked the record, and directed the defendant's attention to the fact that he had first brought out the existence of a prior conviction. The motion was taken under advisement and denied the following morning.

Penal Code section 1025 provides, "In case the defendant pleads not guilty, and answers that he has suffered the previous conviction, the charge of the previous conviction must not be read to the jury, nor alluded to on the trial." "Where a former conviction which is not an element of the crime for which defendant is on trial, is admitted outside the presence of the jury, allusion to it during the trial is forbidden by section 1025, Penal Code, and under the mandate of section 1093 of the Penal Code the clerk in reading the information to the jury must omit any reference to the prior conviction. Violation of either of these sections has invariably been held error and has frequently resulted in reversals. [Citations.]" (*People* v. *Ozuna* (1963) 213 Cal.App.2d 338, 341 [28 Cal.Rptr. 663]. See also *People* v. *Spencer* (1963) 60 Cal.2d 64, 82 [31 Cal.Rptr. 782, 383 P.2d 134] [cert. den. 377 U.S. 1007 (12 L.Ed.2d 1055, 84 S.Ct. 1924)].) Nevertheless, the statement by the prosecutor was a correct statement of law as it applied to any witness. (Evid. Code, § 788, *supra*.) Moreover, the admission by a defendant of a prior conviction does not protect him from impeachment if he elects to become a witness. (*People* v. *Pike* (1962) 58 Cal.2d 70, 93 [22 Cal.Rptr. 664, 372 P.2d 656] [cert. den. 371 U.S. 941 (9 L.Ed.2d 277, 84 S.Ct. 324)]; *People* v. *Martin* (1967) 250 Cal.App.2d 263, 266-267 [58 Cal.Rptr. 481]; *People* v. *Stewart, supra,* 240 Cal.App.2d 1, 7; and *People* v. *Chapman* (1947) 81 Cal.App.2d 857, 863 [185 P.2d 424].)

In this case it is possible that the prospective jurors would attribute the

prosecutor's remarks about witnesses in general to the defendant's status, because the latter's counsel had referred to the weight that the prior juror might give to defendant's testimony if he elected to testify. Standing alone, however, it was not such a reference as would have been significant in a long trial if defendant had elected to refrain from testifying. The court properly overruled the objection and correctly denied the motion for a mistrial.

It was not such a remark as indicated a studied attempt to get improper information before the jury. (Cf. *People* v. *Cabrellis* (1967) 251 Cal.App. 2d 681, 685-688 [59 Cal.Rptr. 795]; and see *People* v. *Stinson* (1963) 214 Cal.App.2d 476, 479-481 [29 Cal.Rptr. 695].) Nor, as in the cases last cited (see 251 Cal.App.2d at p. 687, and 214 Cal.App.2d at p. 481), was it necessary for counsel to bring out on *voir dire* that his client had in fact suffered a prior conviction, or to put his client on the stand to explain the prosecutor's reference. When counsel directly referred to his client's prior conviction, and when defendant took the stand and admitted his prior convictions, any prejudice created by the prosecution, if there had been error, was removed from the case. (See *People* v. *Richardson* (1961) 192 Cal.App.2d 166, 169 [13 Cal.Rptr. 321]; and *People* v. *Chapman, supra,* 81 Cal.App.2d 857, 863.)

No prejudicial error is found in the remarks of the prosecutor on *voir dire,* or in the court's rulings with respect to defendant's objection and motion. Nevertheless, the practice of giving counsel "a great deal of leeway in examination of a jury," professedly engaged in by the trial court, can only produce embarrassment when counsel are permitted "to educate" the jurors on the law and facts. Reports of the Judicial Council hopefully indicate that the practice may be short lived in civil cases. (Cal. Rules of Court, rule 228, effective January 1, 1972.) The Legislature, however, in 1971 failed to amend Penal Code section 1078.

V

The prosecution called a police technician to testify in connection with exhibits which the prosecutor referred to as the clothes the victim was wearing the night she was killed. Defendant requested the court to view the evidence for the purpose of making a ruling under Evidence Code section 352 (see fn. 8, above). The court denied a hearing and instructed the prosecutor to proceed. The record reflects that the prosecutor thereafter exhibited in front of the jury, and had marked for identification, a bloodstained skirt, blouse and brassiere.

Defendant subsequently objected to the admission of this clothing on the grounds that it was so bloodstained as to be prejudicial. Ruling on that

motion was withheld until the prosecution should offer them in evidence. Defendant's motion for a mistrial on the ground that they had been improperly exhibited before the jury was also denied.

Defendant stipulated to the chain of possession of the victim's clothes, but reserved his objection to the admission of the evidence. The objection was overruled and the clothing was admitted in evidence. The judge acknowledged that he had not examined the clothing other than seeing it in court.

The trial judge's observation—"that is the way all evidence comes into Court. It is marked for Identification right before the jury"—displays an inept understanding of exclusionary rules. ▮▮▮ If a question is raised as to the relevancy, competency or prejudicial effect of an item of evidence which is prejudicial in nature, it is absurd to exhibit it to the jury before the question of its admissibility is resolved. In many instances, where there is merely delay in laying a full foundation, no prejudice can result, but at least the exhibition of the article should be prefaced with an offer of proof of the facts which will authorize its admission. ▮▮▮ In the instant case the defendant contends, not that the evidence as admitted was prejudicial, but that the court failed to exercise its discretion under section 352. In *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892], the court stated: "In the circumstances we need neither view these photographs nor determine whether their admission was prejudicial, for it appears on the face of the record that the trial court prima facie abused its discretion as a matter of law in failing to *weigh* the probative value of the photographs in resolving a material issue as against the danger of prejudice to the defendant through needless arousal of the passions of the jurors. [Citations.]" (60 Cal.2d at p. 801.)

In this case, unlike *Ford*, the court did not openly declare that the evidence would be admitted because it was material even though it was prejudicial. At worst the record indicates that the court gave but cursory attention to the problem. Nevertheless, it did in fact rule on the objection. (See *People* v. *Parks* (1968) 263 Cal.App.2d 490, 494-495 [69 Cal.Rptr. 368].) On the record, the defendant has not demonstrated prejudicial error as a matter of law. Since the autopsy surgeon testified that the victim received 12 stab wounds, the bloody clothing could but be cumulative of that testimony, if offered to show the place and nature of the stab wounds. (See *People* v. *Knapp* (1886) 71 Cal. 1, 3 [11 P. 793]; *People* v. *Hong Ah Duck* (1882) 61 Cal. 387, 391; *People* v. *Haydon* (1912) 18 Cal.App. 543, 559-560 [123 P. 1102, 1114]; *People* v. *Bond* (1910) 13 Cal.App. 175, 190 [109 P. 150]; and Witkin, Cal. Evidence (2d ed. 1966) §§ 633-634, pp. 595-598.) By the same token the doctor's testimony, together with a photo-

graph of her body, and eight slides showing the different stab wounds (which were properly admitted over a similar objection by the defendant because they were used to illustrate the doctor's testimony) evidenced that there was heavy bleeding from the victim's wounds. The jury could not have been surprised or prejudiced to discover that the victim's clothes were bloody. No prejudicial error has been demonstrated.

## VI

As indicated in the statement of facts there was evidence that defendant had been drinking in the morning, and in the late afternoon immediately preceding the homicide. Defendant claims that the court erred in failing to give CALJIC instruction No. 4.21[9] on its own motion. Support for this position is found in *People* v. *Baker* (1954) 42 Cal.2d 550 [268 P.2d 705], and *People* v. *Arriola* (1958) 164 Cal.App.2d 430, 435 [330 P.2d 683]. (See also *People* v. *Mosher* (1969) 1 Cal.3d 379, 385 and 389-391 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 491-494 [35 Cal.Rptr. 77, 386 P.2d 677]; and *People* v. *Jackson* (1963) 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937] [overruled on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631 (36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)].) In *Baker* the court referred to "the court's failure to instruct the jury that it could consider defendant's intoxication by drugs in determining whether or not defendant committed the offense [murder of his wife] with premeditation and deliberation. . . ." (42 Cal.2d at p. 573.) An examination of the record in this case reflects that the jury was fully advised with relation to the effect of defendant's intoxication on the nature of the homicide committed.

Preliminarily it is unnecessary to consider the People's contention that the evidence of intoxication—at the time of the commission of the offense—was so slight as to render nonprejudicial any failure to instruct on the subject. (See *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900]; and *People* v. *Arriola, supra,* 164 Cal.App.2d 430, 435-437.) The fact remains that the court did instruct on the effect of intoxication, thereby indicating it considered that there was substantial evidence to support a finding that the defendant was intoxicated. (See *People* v. *Coyne* (1949) 92 Cal.App.2d 413, 417 [206 P.2d 1099].) The question, therefore, is whether the instructions given were adequate.

---

[9]CALJIC No. 4.21 reads in pertinent part: "If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

Defendant did not request CALJIC No. 4.21. On the subject of intoxication he requested and the court gave instructions No. 8.41,[10] No. 8.48,[11] and No. 8.77.[12] This last instruction was immediately followed by the definition of voluntary intoxication found in CALJIC No. 4.22. The court also instructed the jury on involuntary manslaughter when a killing was committed while unconscious due to voluntary intoxication, as found in CALJIC No. 8.47. (See *People* v. *Graham* (1969) 71 Cal.2d 303, 317, fn. 4 [78 Cal.Rptr. 217, 455 P.2d 153], and accompanying text.) The jurors were also told that in case of a reasonable doubt concerning the nature of the offense committed they should select the lesser. (See CALJIC No. 8.71 and No. 8.72.)

It is obvious from reading the instructions that since the jurors were completely instructed on the effect of intoxication on the mental state necessary for each of the categories of homicide, the instruction sought would have been superfluous. No error is shown.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied January 17, 1972, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied February 16, 1972. Peters, J., was of the opinion that the petition should be granted.

---

[10]CALJIC No. 8.41 provides: "Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought.

"There is no malice aforethought [if the killing occurred upon a sudden quarrel or heat of passion or] if the evidence shows that due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not have the capacity to attain the mental state constituting malice aforethought, even though the killing be intentional, voluntary, deliberate, premeditated, and unprovoked."

[11]CALJIC No. 8.48, which defines involuntary manslaughter, concludes: "There is no malice aforethought and intent to kill if by reason of diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not have the mental capacity to harbor malice aforethought and to form an intent to kill."

[12]CALJIC No. 8.77 commences: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter." It then sets forth the effect of such diminished capacity on the intent necessary for first degree murder, the malice necessary for both first and second degree murder, and the intent necessary for voluntary manslaughter.