[Crim. No. 4209.   Third Dist.   June 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES CABRELLIS, Defendant and Appellant.

Peter Fetros, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Stephen Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—A jury found defendant James Cabrellis and two codefendants guilty of first degree robbery. Cabrellis appeals from the judgment.

On the afternoon of February 23, 1966, one Dalton Lyons was driving the three defendants in his car. One of the defendants suggested robbing Cliff's Market, an establishment in Del Paso Heights, an area on the outskirts of Sacramento. Cabrellis and another defendant entered the store. One asked for cigarettes, then the two men reached into the cash register and took money as one of them covered the proprietor with a gun. They then told the proprietor and a newspaper boy to lie on the floor. A customer, alarmed by the appearance of the persons outside the store, noted the license number of Lyons' car. Lyons subsequently became a prosecution witness. Defendant Cabrellis was arrested on March 3, 1966. After viewing three lineups, the robbery victim identified Cabrellis as one of the two robbers in the store. At the trial both the victim and Lyons identified Cabrellis as one of the robbers.

After defendant's arrest on March 3 he was interviewed by Detective Sergeant Holquist and Officer Zine of the Sacramento Police Department. The officers informed him that he had a right to remain silent; that he had a right to an attorney; that anything he said could be "held" against him. Defendant signed a paper admitting these warnings. He then denied participation in the crime and told the officers he had been in Oakland continuously during the three weeks preceding his arrest. There was also a discussion regarding some Keno tickets from a Reno gaming establishment which had been found in his pockets. Subsequently, at defendant's trial, Officer Zine described the foundational facts, then related his own description or summary of defendant's extrajudicial statements. There was no reference to a recording or transcription of the interview. We set out the officer's summary in the margin.[1]

---

[1] "Q [By the prosecutor] Tell us what he said at that time?

"A Yes, sir. He was questioned regarding—told why he was arrested there and he was questioned regarding the robbery.

"Q Robbery of Cliff's Market?

"A Of Cliff's Market, and at that time he denied that he had anything to do with that robbery. So then he was asked regarding any alibis. And he stated that he'd been in Oakland for the past three weeks and that he just arrived in town on the night he was arrested. He stated he came into Sacramento on the Greyhound bus. And also that he said he'd been—he wanted to check at a bowling alley in Oakland on 14th Street; that he was—never had left Oakland during that three weeks. He said that they saw him there. And on his person he was carrying some Keno

Either before or after his interview with the two officers, defendant was interviewed by a deputy district attorney. The latter interview was recorded and a transcript was in court.

There was no defense objection or motion to strike Officer Zine's testimony. Cabrellis took the stand in his own defense. He denied participation in the robbery and denied presence in Sacramento on the date of the crime, February 23. He admitted lying to the officers when he told them that he had been in Oakland during the three weeks preceding his arrest. He testified that he had been continuously in Reno during these three weeks but had not wanted to reveal that fact to the officers since, as a parolee, he was not permitted to leave California. He submitted in evidence the group of Keno tickets taken from him by the police at the time of his arrest. These bore dates of February 16, February 28, March 1 and March 2, 1966.

Following his direct testimony Cabrellis was subjected to extensive cross-examination by the prosecutor, in the course of which he admitted again that he had lied to the police to protect his parole status; denied that the reference to being "sent back" had any connection with the robbery for which he had been arrested; was impeached by evidence that, in the hitherto unrevealed interview with the deputy district attorney, he had admitted coming to Sacramento during the three-week period to see a girl friend; admitted that he had told the same interviewer that he had seen one of his codefendants during the same trip to Sacramento.

█ The only question discussed in the briefs on appeal is whether evidentiary use of Cabrellis' remark: "Why should I tell you anything that would send me back?" violated the *Escobedo-Dorado* restrictions on admissibility of extrajudicial statements made in the course of police interrogation.[2] There was no question but that he was properly warned of his rights to silence and to counsel in conformity with *Escobedo*

tickets which was from Reno, Nevada, and on these Keno tickets it was dated March the 1st, 1966, and these tickets were booked as evidence in our property room. He denies that he left Oakland and insisted that the tickets did not belong to him personally. He stated that—he was asked about where he got his money, and he stated that he got his money from his sister and mother. He also stated that he hadn't—he's not working at the present time. During the interrogation he made a statement and he said, 'Why should I tell you anything that would send me back?' ''

[2]Since defendant was tried before June 13, 1966, admissibility of his extrajudicial statement to the police is not affected by *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct 1602, 10 A.L.R.3d 974]. (*People* v. *Rollins*, 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. His contention is that he did not intelligently and understandingly waive these rights. (*People* v. *Dorado, supra*, 62 Cal.2d at pp. 352-354; *People* v. *Stewart*, 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97].)

Defendant's trial counsel did not object or move to strike Officer Zine's account of the extrajudicial statement or any part of it. This case was tried almost one and one-half years after the *Dorado* decision. Failure to raise the *Dorado* objection at the trial precludes its being raised on appeal. (*People* v. *Larke*, 246 Cal.App.2d 571, 574 [54 Cal.Rptr. 834]; *People* v. *Woods*, 239 Cal.App.2d 697, 704-705 [49 Cal.Rptr. 266], hg. den. by Supreme Court.)

■ The introduction of defendant's rhetorical question to the police interrogator has vices other than its arguable violation of the *Escobedo-Dorado* rule. California law excludes evidence of other crimes when offered solely to prove the criminal character of the accused. Basis of the exclusion is the fact trier's tendency to give excessive weight to evidence of prior criminality, either allowing it to bear too strongly on the present charge or viewing it as justification for condemnation irrespective of present guilt—in brief, that its prejudicial effect outweighs its probative value. (*People* v. *Westek*, 31 Cal.2d 469, 476 [190 P.2d 9]; *People* v. *Baskett*, 237 Cal. App.2d 712, 715-716 [47 Cal.Rptr. 274], quoting 1 Wigmore on Evidence (3d ed. 1940) p. 646; Witkin, Cal. Evidence (2d ed. 1966) p. 299; see Evid. Code, § 1101.) **[3]** A defendant may, if he takes the witness stand, be impeached by proof of a prior felony conviction. (See Witkin, *op. cit. supra*, pp. 1145-1146.) He is constitutionally privileged not to testify at all, thus putting the prosecution to its proof. (U.S. Const., 5th Amend.; Cal.Const., art. I, § 13; former Pen. Code, § 1323.5, applicable to pre-1967 criminal trials; Evid. Code, § 930, applicable to cases tried in 1967 and thereafter.) If such is his choice, prosecution comment or jury instruction reflecting adversely upon his silence violates the federal constitutional privilege against self-incrimination. (*Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People* v. *Bostick*, 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529].) Thus, in the case at bar, defense counsel could embark upon the trial intending to exercise his client's constitutional privilege of silence, preserving his constitutional immunity from cross-examination and armed with reasonable assurance that the

jury would have no inkling of his criminal record. (See Pen. Code, § 1025; *People* v. *Rolon*, 66 Cal.2d 690, 693 [58 Cal. Rptr. 596, 427 P.2d 196]; *People* v. *Stinson*, 214 Cal.App. 2d 476, 480 [29 Cal.Rptr. 695].)

Officer Zine, however, testified that defendant had said: "Why should I tell you anything that would send me back?" The remark immediately and blatantly signified a criminal conviction of the past for which defendant might be "sent back." Even in the eyes of the most unsophisticated juror, the statement marked him as a former prisoner who might be sent back to prison or jail.

Officer Zine's account of the extrajudicial conversation included both admissible and inadmissible portions. ■ The false assertion of defendant's whereabouts during the period in which the crime had been committed was admissible as proof of consciousness of guilt. (*People* v. *Underwood*, 61 Cal. 2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]; *People* v. *Gould*, 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865]; *People* v. *Miller*, 19 Cal.App.2d 708 [66 P.2d 448] [false alibi].) [5a] The remark that he might be "sent back" was admissible or inadmissible according to the sense in which it was uttered. If it signified defendant's fear of a fresh conviction for a fresh crime, it was relevant to prove consciousness of guilt. If it signified his fear of parole revocation for a relatively innocuous trip to Reno, it was immaterial to proof of the present offense and prejudice-arousing as a revelation of his criminal past.[3] One who did not know his parole status might seize the first meaning; one aware of his parole status, would not. In the officer's testimony the remark was removed from its conversational context. There are two salient circumstances at this point. One is that at the time of the officer's testimony both he and the prosecutor knew of defendant's parole status; the other is that the jurors did not.

Because the jurors were unaware of defendant's parole

[3]The danger of misinterpretation inherent in ambiguous declarations offered to prove guilt consciousness was summarized in a concurring opinion in *People* v. *Albertson*, 23 Cal.2d 550, 581-582 [145 P.2d 7]: "False statements by a defendant to those investigating the commission of the crime are admissible if they indicate consciousness of guilt. . . .

". . . Before evidence of false statements by a defendant may be received, the court must determine whether the falsehood is one that may be reasonably construed as implying such an admission; otherwise evidence might be received that is in no way relevant to the issues and therefore seriously prejudicial to the defendant because it indicates to the jury that he is a dishonest person." (See also *People* v. *Wayne*, 41 Cal.2d 814, 823 [264 P.2d 547].)

status and prone to misinterpret his remark, his trial counsel was confronted with a harsh dilemma. Unchallenged, the remark would be viewed by the jurors as evidence of guilt consciousness. To challenge it, would require defendant to take the stand, admit his status as a parolee with a criminal past, claim that he had lied to protect himself against parole revocation and expose himself to cross-examination from which he was otherwise constitutionally immune. As the lesser of two evils, defense counsel chose the latter course.[4] The consequences were particularly disastrous because Cabrellis' cross-examination apprised the jury that he had actually been in Sacramento during the period when he alternately claimed continuous presence in Oakland and Reno.

The prosecution tactic served four objectives, all damaging to the defense: (1) It presented the jury with a counterfeit token of guilt consciousness; (2) it smuggled in illicit evidence of defendant's criminal past and criminal character; (3) it forced defendant to forego his constitutional privilege not to testify; (4) it exposed him to damaging cross-examination. We reluctantly reject the possibility that the prosecution trap was accidentally laid. It worked too efficiently. There are accompanying circumstances indicative of deliberation.[5] It was unlikely that the police interrogators were unacquainted with Cabrellis' criminal record at the time of the interrogation. In all likelihood his fear of being "sent back" was mentioned in the context of the participants' common awareness of his parole status. There is no sign that Officer Zine or the deputy district attorney brought to court notes or a recording or transcription of the interrogation.[6] The officer's testimony had it that the arrested man made his remark "during the interrogation," completely isolating it from any relationship to the statements preceding and following it. Removal from context enlarged the likelihood that the jury would misinterpret it as the revelation of a fresh crime, rather than

[4]A codefendant represented by the same defense counsel was kept off the witness stand.

[5]In *People* v. *Covert*, 249 Cal.App.2d 81, 90-91 [57 Cal.Rptr. 220], we considered similar injection of inadmissible evidence of the defendant's criminal past in a case tried by the same deputy district attorney.

[6]When the prosecutor impeached defendant by inconsistent statements uttered in the course of defendant's interview with a member of the district attorney's staff, he read from a transcript of that interview. No reference to such a transcript appears in connection with Officer Zine's testimony. Other appeals from Sacramento County bear out the observation that recordation of police interrogations is standard practice in that county.

reluctance to admit a parole-violating trip to Reno. **Absence** of a recording or transcription enlarged the likelihood that the true context would remain undiscovered.

A prosecutor is under a duty to guard against inadmissible statements from his witnesses and guilty of **misconduct** when he violates that duty. (*People* v. *Baker*, 147 Cal. App.2d 319, 324 [305 P.2d 97] ; *People* v. *Bentley*, 131 Cal. App.2d 687, 690 [281 P.2d 1].) Here the prosecution injected inadmissible evidence under circumstances which gave it a false coloration and forced the accused to surrender his constitutional right not to take the stand. The **repercussive** effect of the officer's testimony may not have been immediately apparent. When it became apparent that defendant would be forced to take the stand in order to rebut the false inference, a mistrial motion should have been made and granted.

Generally, improper evidence of a past crime does not cause reversal where there is heavy evidence of guilt. (*People* v. *Stinson, supra,* 214 Cal.App.2d at p. 482.) In view of the apparent deliberation of the prosecution trap; its character as a state-sponsored deprivation of a constitutionally assured protection and the serious prejudice springing from it, its reversal-impelling effect is not softened by the absence of a defense objection, motion to strike or assignment of misconduct. (*People* v. *Arends,* 155 Cal.App.2d 496, 506-508 [318 P.2d 532] ; *People* v. *Ford,* 89 Cal.App.2d 467, 471-472 [200 P.2d 867] ; Witkin, Cal. Evidence (2d ed. 1966) pp. 1200-1202.) Possibly the prosecution tactic and its impact upon the subsequent course of the trial made the trial fundamentally unfair, creating reversible error without regard to evidence of guilt. (*People* v. *Sarazzawski,* 27 Cal.2d 7, 11 [161 P.2d 934] ; see *People* v. *Bostick, supra,* 62 Cal.2d at p. 824.) In any event, since the defendant suffered a federal constitutional injury, we cannot affirm unless we are convinced beyond a reasonable doubt that the error was harmless. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) The disastrous consequences of defendant's baring himself to cross-examination leave this court with considerable doubt.

Judgment reversed.

Pierce, P. J., and Regan, J., concurred.