Filed 7/18/13  P. v. Motten CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| THE PEOPLE, | B228663 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA109455) |
| v. | |
| KENYON DAKEITH MOTTEN, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed in part and reversed in part.

Morgan H. Daly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Kenyon Dakeith Motten appeals from the judgment entered following his convictions by juries on count 1 – second degree robbery (Pen. Code, § 211), count 2 – attempted second degree robbery (Pen. Code, §§ 664, 211), two counts of criminal threats (Pen. Code, § 422; counts 3 & 4), count 5 – dissuading a witness by force or threats (Pen. Code, § 136.1, subd. (c)(1)), and count 6 – misdemeanor vandalism (Pen. Code, § 594)[1] with court findings appellant suffered two prior felony convictions (Pen. Code, § 667, subd. (d)), a prior serious felony conviction (Pen. Code, § 667, subd. (a)(1)), and two prior felony convictions for which he served separate prison terms (Pen. Code, § 667.5, subd. (b)). The court sentenced appellant to prison for 20 years. We affirm the judgment in part and reverse it in part.

## FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that about 9:00 p.m. on November 16, 2009, Angelica Alvarez was putting gas in her car at a Mobil gas station at Imperial and Vermont. Jacob Castro, her boyfriend, was in the front passenger seat and her infant daughter was in the back seat.

Alvarez testified that appellant, an African-American, approached her. He told Alvarez that her car had a "hit" on it. Alvarez was standing next to the gas pump, her car was between her and appellant, and the distance between the two was about seven feet. The gas station's lights were operating so Alvarez "had a good look at the defendant that night." Alvarez denied there was a hit on the car but appellant said there was and that he had been sent to kill Alvarez, Castro, and the baby. Alvarez was afraid. At trial, Alvarez identified appellant as the person who made the above statements to her.

Appellant told Alvarez that he was from the Mafia. Appellant lifted his sleeves and, for a short time, showed his tattoos to Alvarez. She testified he showed "us" his tattoos. Castro was in the car but he was watching. Alvarez denied to appellant that he had a hit on her and her family. Appellant said Alvarez better give him money. Alvarez

---

[1]     A jury convicted appellant on count 6 but deadlocked on the remaining counts. Following a retrial, a jury convicted him on the remaining counts.

denied she had money but appellant said Alvarez and Castro better give appellant $20. Appellant, who had a phone, acted as if he were making a call, then suggested he might have been confused about the license plates of Alvarez's car. However, appellant said he was not leaving empty-handed and if Alvarez and Castro did not give appellant money, appellant would kill them in front of their daughter. Alvarez entered the car.

While Alvarez entered the car, appellant went to Castro's side of the car. Appellant was talking to Castro and searching the glove compartment and the side compartment on the door. Appellant was about a foot from Castro. Alvarez was seated in the driver's seat, was about three-and-a-half feet from appellant, and saw his face clearly. Appellant had a teardrop tattoo or something similar near the right corner of his right eye. Alvarez thought appellant had a beard or something like a goatee. Appellant was wearing a brown shirt or sweater, brown cargo shorts, and white tennis shoes. He was about six feet two inches tall.

Alvarez put her key in the ignition and was going to use her phone, but appellant said she better not call the police or do anything or it would be worse for them. Alvarez exited the car and began crying and making "a big scene." Appellant told Alvarez to leave and she drove away with Castro and the baby. At some point appellant took a phone from Alvarez before she left.

Alvarez drove to Castro's brother's house which was about two minutes away and, using another phone, she called the police. Alvarez told a 911 operator what had happened. Alvarez returned to the gas station and saw appellant. Alvarez parked nearby but later drove away because she had been illegally parked. She returned to the intersection about two minutes later and saw appellant outside a liquor store across the street from the gas station. Alvarez drove past appellant, parked in the gas station, and watched him. Appellant eventually sat on a bus stop bench.

Police arrived, called Alvarez on her phone, and asked if the robber was sitting on the bench. Alvarez said yes. Police arrested appellant, called Alvarez, and told her that she had to identify him. Police told Alvarez that just because police had arrested appellant did not mean he was the robber. Police took Alvarez and Castro across the

3

street to a field showup and Alvarez identified appellant from about eight to ten feet away. Police lights illuminated appellant and Alvarez clearly saw him.

At trial, the prosecutor showed Alvarez a photograph of appellant and she testified it depicted the robber. Appellant looked different in the photograph and more like the robber. The photograph depicted the teardrop tattoo on appellant's face. On the night of the robbery, she "saw [appellant] closely" and, on the night of the robbery, and at trial, Alvarez positively identified appellant as the robber.

During cross-examination, Alvarez testified as follows. Alvarez did not remember that appellant had headphones or sunglasses, but she remembered he was wearing a brown shirt. The process of appellant showing "the sleeves" took perhaps two seconds; appellant "just lifted it up right quick and that's it." Alvarez did not look at appellant's tattoos for detail. About ten minutes passed from the time Alvarez initially left the gas station to the time she was with the police. The 911 call reflected the best information Alvarez had at the time. During the 911 call, Alvarez did not mention the robber had arm tattoos. Alvarez did not tell police on November 16, 2009, that appellant had a teardrop tattoo.

Alvarez saw appellant twice in court, was asked to identify him, and noticed his teardrop tattoo. When Alvarez was asked about the arm tattoos at the previous hearing, she did not recall what they were, she was unable to identify them, and she could not make them out or distinguish what they said. The following then occurred during cross-examination: "Q. But, of course, now the [prosecutor] has shown you these tattoos, correct? [¶] A. Yes." The prosecutor showed the tattoos to Alvarez during her last court appearance. Alvarez had seen photographs of the tattoos at least twice prior to trial.

Alvarez and Castro had talked about the November 16, 2009 incident because it was a major event in their lives. However, Alvarez and Castro did not discuss descriptions of the person because the two already knew how the person looked because they had seen the person.

During redirect examination, Alvarez testified that after police arrested appellant, she did not tell police about the teardrop tattoo. The prosecutor asked why she did not

4

tell police and Alvarez replied, "It didn't come to my mind, I guess." When Alvarez identified appellant as the robber when he was sitting at the bus stop, during the field showup, during the two prior hearings, and at trial, she identified him because she recognized his face. At a prior hearing Alvarez had testified that she had not told police about the teardrop tattoo on the phone or after police arrived because appellant had not shown it to her, it was already on his face, and appellant had rolled up his sleeves and displayed his other tattoos.

During recross-examination, appellant played a recording of Alvarez's 911 call. Alvarez remembered describing the robber during the call as a light-complected Black male who had headphones, black sunglasses, a light brown shirt, and white shoes, and she remembered saying that that was all she remembered concerning a description.

During further examination, Alvarez testified as follows. Alvarez did not remember whether, when she saw appellant at the cashier area at the Mobil station, Alvarez saw appellant wearing headphones or sunglasses. A photograph of appellant displayed to her at trial depicted a mustache, and hair on his chin. She saw that hair on appellant on the night of the robbery and at trial.

When Alvarez gave a suspect description during the 911 call, she mentioned only a shirt, not a sweater. At a prior hearing she was asked if she remembered what appellant had been wearing. She testified at that hearing that, because the incident occurred a long time ago, the only thing she remembered was appellant was wearing "like a khaki color, like cargo pants," she was not sure if appellant was wearing a brown shirt or something similar, but he was wearing a big sweater.

Castro testified as follows. Castro was at the gas station and sitting in the passenger seat of the car. In his rear view mirror, he saw someone approach Alvarez while she was pumping gas and saw the two conversing. Appellant and Alvarez talked for perhaps five or seven minutes. Appellant rolled up his sleeves and displayed his tattoos for perhaps a minute. At trial, the prosecutor showed Castro photographs of tattoos on appellant's left arm and asked if Castro could see those tattoos on the night of the robbery. Castro replied, "I do somewhat see them but I couldn't really see them

5

because I was still in the passenger seat." Castro was looking at those tattoos through the rear view mirror. The prosecutor showed Castro photographs depicting tattoos on appellant's right arm. Castro testified he recognized those tattoos on the night of the robbery.

At some point appellant approached Castro, opened the car door, and asked Castro to give appellant money or anything of value in the car. Appellant said if Castro did not, Castro would be hurt. When appellant opened the car door, Castro just glanced at appellant's face because Castro was afraid. Castro testified he was able to look at appellant's face "[l]ike 30 seconds, . . . quick." Appellant was about 18 inches from Castro and was leaning into the car. Appellant searched the glove compartment and the side of the door. Castro remembered appellant's face and, at trial, Castro identified appellant as the robber.

Castro also testified as follows. There may have been teardrop tattoos on the left side of appellant's face but Castro did not remember. When appellant was searching through the car, Castro did not notice tattoos on appellant's arms because Castro was looking at appellant's face. After appellant took a phone out of the car, he went to the driver's side. Alvarez was in the car and already had the key in the ignition. Appellant told her not to leave and threatened to kill Alvarez, Castro, and the baby if Alvarez tried to leave. At trial, Castro identified appellant as the person who took his property and threatened to kill Castro and Alvarez.

Castro and Alvarez went to Castro's brother's house, then returned to the gas station. This took about 10 to 12 minutes. When they returned, appellant was across the street at a liquor store. Castro also testified appellant was in the cashier area at the gas station and was talking to someone, two or three people were with appellant, appellant then went to the liquor store, and later went to a bus stop. The distance from where Castro had been parked at the gas station to the bus stop was about 54 feet. The gas station lighting was bright and a light illuminated the bus stop.

Appellant sat at the bus stop and Castro recognized him as the robber before police arrived. Appellant was wearing a black shirt and cargo shorts. During the field showup,

6

police illuminated appellant and Castro identified him from about 15 to 18 feet away. It was somewhat dark because stores were closed but streetlights were operating. During the showup, Castro saw the tattoo on appellant's face.

During cross-examination, Castro testified that when appellant was showing his tattoos to Alvarez, Castro was watching what was happening. Castro recognized appellant's tattoos because Castro could "see them from afar." Appellant searched the car about five minutes.

When Alvarez was talking with 911 personnel, Castro did not mention that the robber had teardrop tattoos. Castro did not tell police that the robber had teardrop tattoos, but Castro was not the person who had talked with the police. The incident of November 16, 2009, was a major event in his life, and he and Alvarez had discussed it many times. Castro was concerned about, and Castro and Alvarez discussed, the description of the robber. Castro testified he and Alvarez were "trying to see if it was the same person. And it was." The following then occurred during cross-examination: "Q. . . . So some of this that you talked about the fact that the tear drop tattoo isn't in your description, you got information from other people aside from yourself, right? [¶] A. Yeah, it was my girlfriend." (*Sic*.)

At a prior hearing, photographs were shown to Castro and he testified he did not recognize any of the tattoos, he knew appellant had many tattoos, but Castro could not see them from where he had been sitting. At the last hearing, Castro did not testify that the robber had teardrop tattoos. Castro had seen appellant in court previously and Castro had noticed the teardrop tattoos. Castro testified that when the prosecutor prepared Castro for trial, the prosecutor showed Castro photographs of appellant and the teardrop tattoos.

During redirect examination, the prosecutor displayed to Castro a photograph of appellant, and Castro testified it much more accurately depicted what appellant looked like on the night of the robbery than how appellant appeared at trial. The difference was that, at trial, appellant had cut his hair, he was wearing glasses, and he was more presentable. Castro denied remembering whether the robber had facial hair.

7

Los Angeles Police Officer Scott Teubert testified concerning the incident that he arrested appellant. Appellant was wearing a black shirt, tan shorts, and white shoes, and had a teardrop tattoo on his face. The tattoo was visible at trial. Teubert searched appellant but found nothing on him. Appellant presented no defense evidence.

We will present additional facts below as appropriate.

## ISSUES

Appellant claims (1) the retrial court violated his constitutional rights to counsel by precluding his trial counsel during closing argument from commenting on a famous case pertaining to the fallibility of eyewitness identification, (2) the retrial court abused its discretion by receiving evidence that appellant said "I'm not going back" and kicked a police car window, (3) cumulative prejudicial error occurred, and (4) a Penal Code section 667.5, subdivision (b) enhancement must be stricken. Respondent claims the judgment, and the abstract of judgment, must be modified to reflect certain fees and assessments.

Because we will partially reverse the judgment based on our analysis and disposition of appellant's second claim, there is no need to discuss any remaining claims of the parties.

## DISCUSSION

*The Trial Court Erred by Admitting Into Evidence Appellant's Statement in the Police Car.*

1. *Pertinent Facts.*

Prior to the retrial, the prosecutor proffered testimony from Teubert that "during the course of the attempt to kick out the back window the defendant was saying, 'I'm not going back. I'm not going back.' " The prosecutor argued the testimony was relevant to prove appellant's consciousness of guilt. Appellant objected the proffered testimony was irrelevant and prejudicial because at the time of this incident in the police car, appellant already was in custody, police were bringing him back, there were multiple possible explanations for what had occurred, and the vandalism charge already had been resolved.

8

The retrial court concluded the proffered testimony was relevant and not unduly prejudicial. As to the last issue, the retrial court commented the proffered testimony "kind of shows the defendant's conduct in a continuance [*sic*] spectrum and he makes some statements that arguably could be consciousness of guilt." The court indicated the fact the vandalism charge had been resolved did not make the proffered testimony less relevant to the remaining charges.

During the retrial, Teubert testified as follows. Teubert arrested appellant, handcuffing his hands behind his back. Teubert put appellant in the back of the patrol car and transported him to the police station, and appellant was cooperative en route to the station. However, upon arrival, appellant "stated he's not going back and began kicking out the rear window of the police vehicle." When Teubert took appellant out of the patrol car, appellant's hands were handcuffed but they were in front of appellant.

2. *Analysis.*

Appellant claims the trial court abused its discretion by receiving evidence that appellant said "I ain't going back" and that appellant "started kicking the window of the patrol car after arriving at the police station." He argues appellant's statement informed the jury that he had a criminal history; therefore, the trial court should have excluded the evidence under Evidence Code section 352. Respondent argues appellant waived the issue by failing to raise it below. We address appellant's claim to forestall a claim of ineffective assistance of counsel (cf. *People v. Turner* (1990) 50 Cal.3d 668, 708). For the reasons discussed below, we conclude the trial court erred by failing to exclude under Evidence Code section 352 appellant's statement that he was "not going back."

In *People v. Cabrellis* (1967) 251 Cal.App.2d 681, the defendant, during a police interrogation, asked police " 'Why should I tell you anything that would send me back?' " (*Id.* at p. 684.) Although *Cabrellis* did not expressly refer to Evidence Code section 352 (the section was enacted in the same year in which *Cabrellis* was decided), *Cabrellis* observed that other crimes evidence as propensity evidence was inadmissible because the probative value of the evidence was outweighed by its prejudicial effect. (*Id.* at 685.) *Cabrellis* stated, "The [question by the defendant] immediately and blatantly

9

signified a criminal conviction of the past for which defendant might be 'sent back.' Even in the eyes of the most unsophisticated juror, the statement marked him as a former prisoner who might be sent back to prison or jail." (*Id.* at p. 686.)

*Cabrellis* concluded the defendant's question might have been admissible as evidence of the defendant's fear of a future conviction in the current case and thus as evidence of consciousness of guilt in that case, except for the fact the prosecutor deliberately withheld evidence of the context of the question that made it irrelevant, prejudicial as a revelation of the defendant's criminal past, and inadmissible. (*Cabrellis, supra*, 251 Cal.App.2d at pp. 686-688.) *Cabrellis* concluded the prosecutor thus "smuggled in illicit evidence of defendant's criminal past and criminal character." (*Id.* at p. 687.)

In the present case, appellant did not say he was "not going to jail," "not going to prison," or "not going to be incarcerated." He said he was "not going *back*." (Italics added.) Appellant made this statement to a law enforcement officer who had custody of appellant and had transported him to the police station as part of criminal proceedings that could lead to appellant's convictions for the crimes that occurred at the gas station.

We believe appellant's statement was other crimes evidence because it reasonably implied *prior* incarceration and appellant's unwillingness to be incarcerated *again*. The statement implied appellant's prior incarceration either as (1) a prisoner who had suffered a felony conviction(s) (and who perhaps had been released on parole) or (2) a jail inmate who had suffered a misdemeanor conviction(s) or who was awaiting disposition of a criminal (felony or misdemeanor) charge(s). These facts are not altered by the fact appellant's statement implied he was concerned about being incarcerated for the present offenses (counts 1 - 5) as well. Appellant's statement he was "not going back" was inadmissible other crimes evidence. (Cf. *Cabrellis*, *supra*, 251 Cal.App.2d at p. 687.)

Moreover, on this record, we believe the other crimes evidence was prejudicial. In particular, as discussed below, Alvarez's identification testimony was often contradictory, often conflicted with other People's evidence, and called into question whether her identification testimony was based on her independent memory of the

10

robbery as opposed to the cumulative effect of incremental exposure to appellant after the robbery. In the present case, Alvarez testified at trial that appellant had a teardrop tattoo near the corner of his right eye, she thought he had a beard or something like a goatee, and he had tattoos on his arms. She also testified appellant was wearing a brown shirt or sweater, brown cargo shorts, and white tennis shoes.

However, she also testified the 911 call reflected the best information she had at that time. After the 911 call was played in court, Alvarez testified she remembered describing the robber during that call as a light-complected Black male who had headphones, black sunglasses, a light brown shirt, and white shoes, *and she remembered saying that that was all she remembered concerning a description.* She did not therefore testify that, during that call, she mentioned a teardrop tattoo, a beard or goatee, tattoos on the robber's arms, or the robber wearing a sweater.

Moreover, Alvarez did not tell police on November 16, 2009, that appellant had a teardrop tattoo. When asked why she did not tell police about the teardrop tattoo after appellant was arrested, she replied, "It didn't come to my mind, I guess." Further, at a prior hearing, she testified that she had not told police about the teardrop tattoo on the phone or after police arrived because appellant had not shown it to her, it was already on his face, and appellant had rolled up his sleeves and displayed his other tattoos. It is not clear how that testimony adequately explained why she did not tell police about the teardrop tattoo at least when she was on phone.

On the other hand, Alvarez saw appellant in court twice prior to trial and saw his teardrop tattoo. Alvarez had seen photographs of appellant's tattoos at least twice prior to trial. The prosecutor showed the tattoos to Alvarez during the last court appearance and at trial. Yet Alvarez's trial testimony suggested appellant showed his arm tattoos to her for perhaps two seconds. Thus, Alvarez's identification of appellant by his teardrop tattoo and arm tattoos may well have been the product of incremental exposure to same after the robbery.

As indicated, Alvarez testified at trial that appellant was wearing a brown shirt. During the 911 call (i.e., closer to the time of the robbery), she said it was a light brown

11

shirt. However, Teubert testified appellant was wearing a black shirt. Moreover, at a prior hearing, Alvarez testified she was not sure if appellant was wearing a brown shirt or something similar, but he was wearing a big sweater. Yet Alvarez did not refer to a sweater during the 911 call.

During the 911 call, Alvarez said the robber was wearing headphones and black sunglasses. However, at trial, she denied remembering whether appellant was wearing headphones or sunglasses when she saw him at the cashier at the Mobil station. Teubert arrested and searched appellant but found nothing on him, i.e., appellant apparently did not possess headphones or sunglasses at that time.

Similarly, Castro's identification testimony was often conflicting and called into question whether his identification testimony was based on his independent memory of the robbery as opposed to the cumulative effect of incremental exposure to appellant after the robbery. Castro testified he was looking at appellant's tattoos through the rear view mirror. Yet when the robber was searching the car, Castro did not notice tattoos on the robber's arms. At a prior hearing, photographs were shown to Castro and he testified he did not recognize any of the tattoos, he knew appellant had many tattoos, but Castro could not see them from where he had been sitting.

Castro testified that when the robber opened the car door on Castro's side of the car, Castro just glanced at the robber's face. Castro denied remembering if there were teardrops on the left side of the robber's face. When Alvarez was talking with 911 personnel, Castro did not mention the robber had teardrop tattoos. Castro saw the tattoo on appellant's face during the field show-up. Castro did not tell police that the robber had teardrop tattoos. Castro did not testify at the last hearing that the robber had teardrop tattoos.

On the other hand, Castro had seen appellant in court before and had noticed the teardrop tattoos. When the prosecutor prepared Castro for trial, the prosecutor showed Castro photographs of appellant and the teardrop tattoos. A portion of Castro's testimony suggested he had obtained information about any teardrop tattoo from Alvarez.

12

Other conflicts and testimony call into question the identifications of Alvarez and Castro. Alvarez at one point testified to the effect the robber showed his arm tattoos perhaps two seconds. Castro testified appellant rolled up his sleeves and displayed his tattoos for perhaps a minute. Alvarez and Castro testified to the effect the robbery was a major event. However, Alvarez denied, while Castro confirmed, that the two discussed descriptions of the robber. Police found appellant sitting on a bus bench across the street from the robbery site. Teubert searched appellant but found nothing on him.

*Cabrellis* reviewed the evidentiary error in that case under the standard of prejudice enunciated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] because once the defendant's question was, as a deliberate prosecutorial tactic, admitted into evidence, the defendant was forced to testify to explain its innocuous import. This deprived the defendant in *Cabrellis* of his constitutional rights not to testify and not to be cross-examined. (*Cabrellis, supra,* 251 Cal.App.2d at pp. 686-688.) Those facts are not present in this case.

We test the issue of prejudice in this case under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) for state law error, i.e., whether it is reasonably probable that a result more favorable to appellant would have occurred absent the error. We note " 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." [Citation.]' [Citation.]" (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

There is no dispute as to the sufficiency of the identification evidence but, in light of our above discussion, we believe this is a close case on the issue of whether the identifications of Alvarez and Castro were based on their respective memories of what happened during the robbery, or whether those identifications were based upon a factor(s) other than those memories. The inadmissible other crimes evidence very well may have tipped the jury's scale in favor of conviction on counts 1 through 5. Moreover, we note the trial court gave no limiting instruction concerning the other crimes evidence, i.e., the court did not instruct the jury that they could not consider appellant's statement as propensity evidence or evidence of his bad character.

13

We believe there is a reasonable chance a result more favorable to appellant would have occurred as to counts 1 through 5 if the other crimes evidence had not been erroneously admitted into evidence.  (*Watson, supra,* 46 Cal.2d at p. 836.)  Accordingly, we will reverse the judgment of conviction on counts 1 through 5, permitting a retrial on those counts, but we will otherwise affirm the judgment.

We express no opinion as to whether a retrial should or should not occur as to counts 1 through 5.  Nor do we express any opinion as to whether appellant's statement that he was "not going back" could be sanitized.  Nor do we express any opinion as to the admissibility of evidence that appellant began kicking out the rear window of the police vehicle (counts 1 – 5).

## *DISPOSITION*

The judgment is affirmed, except the judgment of conviction as to count 1 – second degree robbery, count 2 – attempted second degree robbery, two counts of criminal threats (counts 3 & 4), and count 5 – dissuading a witness by force or threats is reversed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

15