Filed 3/23/22  P. v. Branks CA1/3
Opinion following rehearing

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADAM DOUGLAS BRANKS,<br><br>    Defendant and Appellant. | A158498<br><br>(Napa County Super. Ct. No. 18CR004041) |

Defendant Adam Douglas Branks appeals after a jury found him guilty of attempted murder and various other crimes.  On appeal, defendant argues:  (1) the evidence is insufficient to support his attempted murder conviction; (2) a witness improperly and prejudicially testified about his parole status; (3) trial counsel was ineffective; (4) the trial court erred in admitting expert testimony; (5) the court committed instructional error; and (6) cumulative prejudice requires reversal.  In supplemental briefing, defendant raises a number of sentencing issues.  We agree that several of defendant's claims concerning sentencing require us to remand the matter to the trial court.  In all other respects, we affirm the judgment.[1]

---

[1]     After issuing an initial opinion in this case remanding the matter to the trial court for consideration of sentencing issues but otherwise affirming the judgment, we granted defendant's request for a rehearing because his

## FACTUAL AND PROCEDURAL BACKGROUND

Around the summer of 2018, defendant and V.M. began dating.[2] Shortly into the relationship, defendant took V.M.'s car keys and phone, and stopped working so that he could sit in her car and watch her while she was at work. He dictated where she could go, and after he got thrown out of the shelter where they lived, he prohibited her from returning there. The two started living in V.M.'s car and camping in Marin County. Because defendant would not allow V.M. to return to the shelter to shower, she stopped working. Defendant regularly physically and verbally abused V.M. and forced her to panhandle. He threatened to kill her with two knives that he kept in plain view in the car. V.M. told no one, including the police, about what was happening because he threatened her "[a] lot."

Around November 2018, the two began staying near Napa. On December 17, 2018, after hitting and accusing V.M. of looking out of the windows at people, defendant stabbed V.M. in the thigh. He then used glue to close her wound and would not let her go to a hospital.

Two days later, when V.M. returned to defendant and her parked car after stealing food from a grocery store, she noticed a bottle of whiskey in between defendant's legs that had previously been "pretty full" was halfway gone. The bottle was neither small nor "Costco" sized. V.M. testified she did not initially realize defendant was drunk, but when he drove "his motor skills were off," he could barely steer, and he was going over curbs and laughing.

appellate counsel did not receive this court's notice of opportunity to request and participate in oral argument, and counsel asserted he would not have waived oral argument had he received the notice. We subsequently heard oral argument in this matter, and now, after due consideration, issue this opinion again affirming the judgment in the manner indicated.

[2] Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to this victim by her initials only.

V.M. begged him to let her drive. He refused and laughed at her, repeatedly unbuckling her seat belt, pressing on the gas pedal, and slamming the brakes, causing her to fly forward toward the windshield. V.M. tried to get out of the car as it was moving, but defendant forcibly kept her inside, ripping out her hair and striking her.[3] At some point, defendant told V.M. that police officers were behind them, and he led them on a high-speed chase. V.M. begged to be let out of the car; defendant refused, telling her that there was going to be a high-speed chase, that she was going to die right then, and that he was going to kill her. When defendant eventually slowed down, V.M. jumped out of the car. According to V.M., defendant tried to run her over after she jumped out.

Napa County Deputy Sheriff Maureen Patterson testified that she pursued defendant from the border of Napa and Solano Counties down westbound State Route 37 and was joined by multiple other deputy sheriffs and a California Highway Patrol (CHP) unit. As they approached Skaggs Island, defendant slowed down to around 15 miles per hour, and Deputy Patterson saw V.M. jump out of the vehicle and run toward her patrol vehicle; V.M. was covered in blood and screaming. Deputy Patterson then heard what sounded like defendant putting "pedal to the metal," and she saw defendant reverse his vehicle and ram the CHP vehicle.[4] Then, hearing what sounded like an engine "rev[ving]" at "[m]ax capacity," Deputy Patterson saw defendant aim his vehicle at the side of her patrol vehicle, right where V.M. was running. Napa County Deputy Sheriff Jeff Scott, who was Deputy

---

[3]     Another driver on the road testified that he saw defendant hitting V.M. in the car relentlessly.

[4]     CHP Officer William Parker was sitting in the vehicle when defendant hit it. His vehicle was totaled as a result of defendant hitting it.

Patterson's passenger, also testified that defendant drove his vehicle so that it pointed directly at V.M.

Believing defendant was going to run V.M. down, Deputy Scott yelled for Deputy Patterson to stop him. Deputy Patterson drove into defendant's car and pushed it away from V.M. Thereafter, defendant drove around Deputy Patterson and Deputy Scott's vehicle, following V.M.'s path before fleeing westbound on State Route 37.

Back on the highway, Napa County Deputy Sheriff Cecil Brown struck and immobilized defendant's car. Defendant then fled on foot into the marsh adjacent to State Route 37 where he remained for nearly two hours, refusing to comply with various officer commands. Ultimately, a helicopter had to extract defendant from the marsh. In the hospital, defendant was violent and combative.

The People charged defendant with: attempted willful, deliberate, and premeditated murder (Pen. Code, § 187, subd. (a),[5] count one); kidnapping (§ 207, subd. (a), count two); assault with a deadly weapon (§ 245, subd. (a)(1), counts three and fourteen); assault upon a peace officer or firefighter (§ 245, subd. (c), count four); dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1), count five); criminal threats (§ 422, count six); corporal injury to a person the defendant is dating (§ 273.5, subd. (a), counts seven and thirteen); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4), count eight); evading an officer in willful disregard (Veh. Code, § 2800.2, subd. (a), count nine); vandalism (§ 594, subd. (b)(1), count ten); resisting an executive officer (§ 69, count eleven); and resisting, obstructing, or delaying a peace officer (§ 148, subd. (a)(1), count twelve). As

---

[5] All further statutory references are to the Penal Code unless otherwise indicated.

4

to counts three and four, the People alleged defendant used a vehicle as a deadly weapon (Veh. Code, § 13351.5, subd. (a)). As to counts seven, eight, thirteen and fourteen, the People alleged defendant personally inflicted great bodily injury (§ 12022.7, subd. (e)). The People also alleged defendant had one prior strike (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and a prior serious felony conviction (§§ 667, subd. (a), 667.5, subd. (b)).

During closing arguments, defendant conceded guilt as to the charges of corporal injury against V.M. (counts seven and thirteen), assault by means likely to produce great bodily injury (count eight), and assault with a deadly weapon (count fourteen), which arose from his beating V.M. on the day of the chase and stabbing her in the leg two days prior. He also conceded guilt as to evading an officer in willful disregard (count nine), and vandalism arising from his ramming into a patrol vehicle (count ten). A jury convicted him of all counts and found true the enhancement allegations, except the allegation that the attempted murder was willful, deliberate, and premeditated and the great bodily injury allegations as to counts thirteen and fourteen. Defendant admitted the prior strike and the prior conviction allegations. The trial court sentenced defendant to a total term of 36 years and eight months in prison.

## DISCUSSION

### A. Sufficiency of the Evidence

Defendant urges reversal of the attempted murder conviction (count one) on the ground that there is insufficient evidence of his intent to kill V.M.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is

5

reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, V.M. testified that throughout their relationship, defendant acted abusively, threatened to kill her regularly, and also threatened her family.[6] During the car chase, defendant told her several times that he was not going to pull over, that she "was going to die right then and there," and that he was going to kill her. He told her there would be a high-speed car chase that would end in a car crash or with her dead.

Defendant's conduct after V.M. escaped from the car was consistent with his threats. Deputies Scott and Patterson both testified to the effect that defendant would have struck V.M. had Deputy Patterson not rammed her vehicle into his. Afterward, defendant followed V.M.'s path around the deputies' vehicle, before fleeing down State Route 37. Video evidence of the incident, particularly the video taken by a citizen witness, also showed that defendant maneuvered his car in order to drive toward V.M. and follow her path as she ran around a patrol vehicle.

On this record, there was ample evidence supporting the conclusion that defendant specifically intended to kill V.M. and took a direct but ineffectual step toward doing so.

Defendant, however, claims the testimony of CHP Officer Parker and a citizen witness established that he merely circled the deputies' vehicle to flee and was not trying to kill V.M. While these two witnesses gave testimony

---

[6]     Defendant once told V.M. he was going to slit her throat and throw her body into a ditch and cover her with leaves.

6

that may have supported defendant's claim based on what they were able to see, the jury was not bound to reject all the evidence supporting the People's case.

Noting that the jury rejected the premeditation allegation, defendant additionally argues the jury would have had to find that he formed the intent to kill almost instantaneously after V.M. exited the vehicle.[7] On this score, he suggests he could not have formed the intent to kill that quickly while driving erratically in front of numerous peace officers and while intoxicated. Instead, he argues, "the manner in which [he] carried out what was charged as attempted murder showed . . . that his acts were committed not only without reflection but were utterly irrational." This is unpersuasive. Our task is to decide whether substantial evidence supports the attempted murder conviction. As stated, there is. To the extent defendant is asking us to reweigh evidence, we decline to do so.

## B. Defendant's Parole Status and Past

Defendant argues V.M.'s mention on the stand of his parole status and his "past" was severely prejudicial to his right to a fair trial and requires reversal. We reject this.

### 1. Additional Facts

Prior to trial, the prosecutor noted that defendant was on parole at the time of the offenses and that she planned to call two of his parole officers as witnesses. Defense counsel asked the trial court to exclude defendant's parole status as more prejudicial than probative, but indicated a willingness

---

[7] Defendant cites no authority holding we should draw meaning from the jury finding not true the premeditation allegation. It seems speculative to do so, as this might have reflected any number of factors, including lenity, compromise, or mistake. (Cf. *People v. Santamaria* (1994) 8 Cal.4th 903, 913.)

to enter a stipulation so that the prosecutor could introduce other relevant evidence. The court ruled defendant's parole status was prejudicial, though it was unsure it was "unduly" prejudicial. The court indicated it wanted the evidence sanitized so there would be no mention of defendant's parole status and instructed the parties to tell witnesses. The prosecutor indicated she would advise V.M.

On direct examination of V.M., the prosecutor asked why defendant did not go with her into stores to steal food, and V.M. said, "[b]ecause he was on parole. Oh. Sorry." Defense counsel immediately objected, and the court sustained the objection, struck the answer, and told the jury not to consider the statement for any reason. Defense counsel—who said he did not think the prosecutor tried to elicit the answer intentionally—asked for a mistrial. Outside the presence of the jury, the prosecutor stated she told V.M. not to discuss defendant's parole status or his being in prison previously. This was later confirmed by a witness who testified the prosecutor told V.M. at least 10 times and in various ways not to mention the word "parole" or defendant's criminal history.

Ultimately, the trial court denied the mistrial motion, finding no prosecutorial bad faith and stating its belief that the jury could follow its curative instruction because this was not a case with "a closely balanced state of evidence."

Later, when defense counsel cross-examined V.M. and asked about her substance use, V.M. said it was not fair she was being asked questions about her past when she could not "have anything answered about [defendant's] past." Defense counsel did not object to this comment, and though the comment was made while the aforementioned mistrial motion was pending, defense counsel did not expand the motion to include it.

## 2. *Analysis*

" '[A] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Cox* (2003) 30 Cal.4th 916, 953 (*Cox*).) "A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) "[E]xposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580.)

" 'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured.' " (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428–1429.) "It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*).) "Improper evidence of prior offenses results in reversal only where the appellate court's review of the trial record reveals a closely balanced state of the evidence." (*People v. Stinson* (1963) 214 Cal.App.2d 476, 482 (*Stinson*).) Trial courts are " ' "vested with considerable discretion in ruling on mistrial motions." ' " (*Cox, supra*, 30 Cal.4th at p. 953.) We review a ruling on a motion for a mistrial for abuse of discretion.[8] (*Ibid.*)

---

[8] The People analyze the present issue as one about whether the trial court abused its discretion in denying the mistrial motion. In his reply brief, defendant argues we should review the issue de novo as an issue of law. We cannot agree with defendant's position. (*People v. Chatman* (2006) 38 Cal.4th 344, 369–370 (*Chatman*) ["Whether a particular incident is incurably

9

Here, the trial court sought to bar mention of defendant's parole status as prejudicial, but when V.M. briefly mentioned his parole status the court immediately addressed the situation by striking the comment and admonishing the jury not to consider it for any reason. Given the court's swift corrective action and all the testimonial and video evidence of defendant's guilt, no basis for a reversal appears. (See *People v. Harris, supra,* 22 Cal.App.4th at pp. 1580–1581 [denying mistrial was not reversible error where the court struck a witness's improper mention of a defendant's parole status and admonished the jury, because the evidence of guilt was overwhelming and undisputed]; *Stinson, supra,* 214 Cal.App.2d at pp. 479–483 [no error in refusing a mistrial where the court immediately struck a witness's improper mention of a defendant's parole status and admonished the jury, because there was no reasonable probability the jury would have acquitted the defendant sans the improper remark].)

Defendant's authorities do not compel a contrary conclusion. Unlike the situation here, defendant's cases found error in not granting a mistrial where the evidence was "extremely close" (*Allen, supra,* 77 Cal.App.3d at pp. 934–935 [the outcome depended on the credibility of the defendant and each sides' witnesses]); the witness improperly referenced an inadmissible statement in a way that suggested there was a confession, and the evidence of guilt was not overwhelming (*People v. Navarrete* (2010) 181 Cal.App.4th

prejudicial requires a nuanced, fact-based analysis."]; cf. *People v. Williams* (1997) 16 Cal.4th 153, 211 [" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' "].) The trial court is in a better position to judge the prejudicial effect of a volunteered statement. Thus, we will apply the traditional abuse of discretion standard. (*Cox, supra,* 30 Cal.4th at p. 953.) But even if we considered the matter independently, we would reject this claim on this record.

10

828, 831, 834–837 (*Navarrete*)); and the improper comment effectively denied the defendant of his right not to testify (*People v. Cabrellis* (1967) 251 Cal.App.2d 681, 686–688 (*Cabrellis*)).

In contrast to the remarks made in *Navarrete* and *Cabrellis*, V.M.'s remarks did not implicate rights or issues of a constitutional nature. And as indicated, the evidence supporting the attempted murder conviction was not close but was ample and strong. There was video evidence and witness testimony that defendant purposefully drove his car at V.M., as well as victim testimony and other evidence that he intended to kill her. The circumstances here bear no resemblance to those at issue in *Allen, Navarrete*, and *Cabrellis*.[9]

As indicated, V.M. also commented during her cross-examination that it was not fair she was being asked questions about her past when she could not "have anything answered about [defendant's] past." But because defendant lodged no objection, any claim of error concerning the remark has been forfeited. In any event, the remark was, in context, a nonresponsive retort when defense counsel was asking V.M. questions about her substance abuse. The remark did not specifically concern defendant's criminal history or suggest a particular inference about his criminal history. (*Allen, supra*, 77 Cal.App.3d at p. 934.) Consequently, it is not reasonably probable that a

---

[9] Defendant cites a few other cases in passing, but none supports reversal. (E.g., *People v. Gomez* (1957) 152 Cal.App.2d 139, 141–144 [erroneous impeachment of defendant with prior juvenile conduct warranted reversal because the case turned on the defendant's credibility, which was diametrically opposed to the testimony of the prosecutor's witness, and where "the indirect evidence was meager and equivocal"]; *People v. Bentley* (1955) 131 Cal.App.2d 687, 689–692 [reversal warranted where a police officer mentioned the defendant was questioned about his involvement in a prior case, because the testimony of the child victim indicated she was coached], overruled on other grounds in *People v. White* (1958) 50 Cal.2d 428, 431.)

result more favorable to defendant would have been reached but for this ambiguous remark. This remains true even if the remark is considered together with V.M.'s other remark about defendant being on parole.

Before concluding this discussion, we note that defendant's reply brief suggests the prosecutor committed misconduct because she failed to admonish V.M. concerning the court's pre-trial ruling. Defendant, however, fails to acknowledge the evidence in the record that the prosecutor did admonish V.M. multiple times, in multiple ways, prior to her taking the stand. In any event, this prosecutorial misconduct claim comes too late. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. 10.)

Citing *Navarrete*, defendant's reply brief also seems to suggest that reversal is warranted because V.M. intentionally and in bad faith made the statements at issue. This is unpersuasive, as *Navarrete* clearly indicates its reversal was *not* due to the witness having willfully made the errant statement. (*Navarrete*, *supra*, 181 Cal.App.4th at p. 836.)

In sum, we reject defendant's claim that V.M.'s statements require reversal.

## C. Ineffective Assistance of Counsel

Defendant claims his trial counsel performed deficiently by not objecting to "improper opinion testimony" consisting of the following: (1) V.M. testified that after she got out of the car, defendant "turned the car around and tried to run [her] over"; (2) Deputy Patterson testified she saw defendant "aiming right towards [V.M.] as she was running toward" Deputy Patterson's patrol car; (3) Deputy Scott testified he observed defendant aim his vehicle directly at V.M. and believed defendant was trying to run V.M. down; and (4) Deputy Brown testified that as he approached Skaggs Island

12

Road, he heard Deputy Scott say that defendant's car had "tried to run over the female victim."

To demonstrate ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his [or her] testimony." "Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman, supra,* 38 Cal.4th at p. 397.) "For example, testimony that another person was intoxicated [citation] or angry [citation] or driving a motor vehicle at an excessive speed [citation] conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts." (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.) A witness may not, however, express an opinion

as to the guilt or innocence of the defendant, or whether a crime has been committed. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.)

Here, as the People suggest, it is unclear that objections to all of the foregoing testimony would have been well-founded. For instance, V.M.'s testimony that defendant tried to run her over was based on her perception, and it reasonably described his behavior as being consistent with a state of mind. (*Chatman*, *supra*, 38 Cal.4th at p. 397.) Likewise, Deputy Patterson and Deputy Scott's testimony that defendant was aiming at V.M. was based on their eyewitness perceptions, and arguably their opinions were helpful to understanding why, for example, Deputy Patterson rammed into defendant's vehicle.

In any event, defendant fails to establish that defense counsel rendered deficient performance by failing to object. Apart from the alleged improper opinion testimony, there was plenty of testimony from V.M., Deputy Patterson, and Deputy Scott setting forth objective facts about what defendant did. For instance, V.M. testified that defendant drove the car at her and that he followed her as she ran around a patrol car to try and "block" him. Deputy Patterson testified she rammed into defendant's car, pushing it away from V.M., and thereafter V.M. ran around her patrol vehicle as defendant followed V.M.'s path. Deputy Scott testified after V.M. jumped out of the car, defendant drove directly at V.M. and circled around the patrol vehicle as did V.M. Although an objection to the brief and allegedly improper opinion evidence might have been sustained, such an objection could have provoked even more testimony about defendant's actions. For similar reasons, we cannot say the allegedly improper opinion testimony was prejudicial; it merely supplemented the facts to which these eyewitnesses testified, as well as what the jurors were able to view for themselves on the

14

video evidence. The jurors also heard from Deputy Scott who, on cross-examination, made clear he could not read defendant's mind and was merely testifying about his observations and what he thought defendant intended to do.

As for Deputy Brown's statement that he heard Deputy Scott say defendant "tried to run over the female victim", defendant characterizes this as hearsay. But viewed in context, Deputy Scott was giving a narrative about the details of his chase of defendant, and the statement was not specifically elicited or offered to prove the truth of the matter asserted. In any event, the jurors had just heard Deputy Scott testify that he believed defendant was trying to run V.M. over. That Deputy Brown testified he heard Deputy Scott make essentially the same statement out of court was merely cumulative and not prejudicial.

### D. Admission of Expert Testimony

During trial, Melissa Kelly, an investigator for the Napa County District Attorney's office, testified as an expert regarding domestic violence. She testified about domestic violence victims recanting and minimizing abuse, the "cycle of violence," and the reasons why some victims remain in abusive relationships. She also testified about the various tactics that perpetrators of domestic violence use to gain or maintain power and control over victims.

Defendant does not contend Kelly was unqualified to give her expert testimony. Nevertheless, he focuses on Kelly's testimony about how and why victims often minimize or recant allegations of abuse, and argues the admission of this testimony was erroneous because the defense never challenged V.M.'s credibility or the nature of the abuse. Moreover, he claims that "because Ms. Kelly had been actively involved in the prosecution of the

15

case, and hence was not a neutral witness, such testimony was not only error but prejudicial because it placed an imprimatur of authenticity on the prosecution's case with regard to all of the charged counts."  We conclude there was no error.

Expert testimony regarding intimate partner battering, "including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence," is generally admissible as long as the proponent of such evidence establishes its relevance and the proper qualifications of the expert.  (Evid. Code, § 1107, subds. (a)–(b).)  "Abuse" includes intentionally causing bodily injury or putting a person in "reasonable apprehension of imminent serious bodily injury"; "domestic violence" includes abuse perpetrated amongst persons who are cohabitating or dating.  (Fam. Code, §§ 6203, subd. (a)(1), (3), & 6211, subds. (b)–(c); Evid. Code, § 1107, subd. (c).)

Here, Kelly's expert testimony was plainly relevant to the issue of V.M.'s credibility by explaining why V.M. stayed with defendant and did not report the abuse if it were true that defendant abused her.  Although defendant asserts the defense did not challenge V.M.'s credibility or the occurrence of abuse, the record reflects that the defense did in fact ask V.M. whether she had told anyone about what was going on, and that the defense argued during closing argument that no witnesses could corroborate the occurrence of abuse until late December.

Moreover, "there is no requirement that the defendant explicitly challenge a witness's credibility on a basis that might be explained by [intimate partner battering] evidence before such evidence may be

16

introduced."[10] (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) "Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by [intimate partner battering] evidence." (*Ibid.*) Thus, whether or not the defense affirmatively attacked V.M.'s credibility, the People sought to prove the offenses in large part via V.M.'s testimony, which called for the jury to evaluate her credibility. That defendant conceded the occurrence of abuse and refrained from fully attacking V.M.'s credibility were insufficient to block the People from introducing evidence of intimate partner battering to bolster V.M.'s credibility. (Cf. *People v. Sakarias* (2000) 22 Cal.4th 596, 629.)

Defendant asserts that "because Ms. Kelly had been actively involved [as an investigator] in the prosecution of the case, and hence was not a neutral witness," her expert testimony "was not only error but prejudicial because it placed an imprimatur of authenticity on the prosecution's case with regard to all of the charged counts." As defendant seems to acknowledge, Kelly did not testify about her investigative duties in this particular case. The claim that Kelly "placed an imprimatur of authenticity on the prosecution's case" is unsupported.

Citing *People v. Bledsoe* (1984) 36 Cal.3d 236, defendant relatedly asserts that "the fact that [Kelly] was an employee of the district attorneys' office, and in that role helped explain why and how victims of abuse on occasion might display behavior that was understandable and which should not reflect negatively on their credibility, created 'an aura of special

_____

[10]     " 'Intimate partner battering and its effects' " has replaced " 'battered women's syndrome' " in legal parlance. (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1.)

reliability and trustworthiness' that not only buttressed [V.M.'s] credibility but likely engendered sympathy for her." This is unavailing. *Bledsoe* involved an expert who testified that an alleged rape victim suffered from "rape trauma syndrome," but the testimony was offered "as a means of proving" the victim was raped and "not to rebut misconceptions about the presumed behavior of rape victims." (*Bledsoe*, at pp. 243–244, 248.) After concluding that rape trauma syndrome may not be used to prove that a rape occurred because "the literature does not even purport to claim that the syndrome is . . . scientifically reliable" for that purpose, the court added that " '[permitting] a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped, unfairly prejudices the appellant by creating an aura of special reliability and trustworthiness.' " (*Id.* at p. 251.) Here, Kelly did not testify about her interactions with V.M. and, unlike the situation in *Bledsoe*, her testimony was not offered as proof that defendant abused V.M.

We conclude there was no error in admitting Kelly's testimony.[11]

### E. Instructions on Voluntary Intoxication

Defendant argues the trial court erred by not instructing the jury with CALCRIM No. 3426, a standard pattern instruction on voluntary intoxication.[12]

---

[11] Having reached this conclusion, we do not address arguments raised for the first time in the reply brief that portions of Kelly's testimony should have been excluded under Evidence Code section 352 and that there was no evidence V.M. was affected by "battered women's syndrome." (*Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 852, fn. 10.) We also note defendant's acknowledgement that his claim about Kelly's testimony does not independently establish prejudice warranting reversal.

[12] CALCRIM No. 3426 instructs that evidence of voluntary intoxication may only be considered in deciding whether a defendant acted, or failed to act, with a required specific intent or mental state.

It is settled that a trial court has no sua sponte duty to give an instruction regarding voluntary intoxication. (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014 (*Castillo*).) Here, defendant's claim that he requested CALCRIM No. 3426 is not borne out by the record. On the day that the jury was instructed, the parties and the court discussed instructions, and the defense did not ask for any instruction on voluntary intoxication. The next day there was a discussion about instructing on voluntary intoxication, but the defense requested *only* CALCRIM No. 625, which instructs on the effect of voluntary intoxication on the mental states required for homicide. After agreeing to give that instruction, the court obtained the defense's confirmation that no other instruction was requested. The court then instructed the jury with CALCRIM No. 625[13] and permitted arguments about it.

In his reply brief, defendant seems to acknowledge defense counsel did not explicitly ask for CALCRIM No. 3426. Instead, he pivots to the contention that because the relevance of voluntary intoxication to several counts was brought to the court's attention, "it was incumbent on the trial court to instruct not only with CALCRIM [No.] 625 which pertained to the specific intent to kill, but the effect of that impairment on all the specific intent crimes or crimes requiring knowledge of a material fact." This, however, is tantamount to an argument that the court should have sua

_____

[13] The trial court instructed with CALCRIM No. 625 as follows: "You may consider evidence, if any, of the defendant's involuntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose."

19

sponte instructed with CALCRIM No. 3426. We reject that argument as contrary to precedent. (*Castillo*, *supra*, 16 Cal.4th at p. 1014.) For the same reason, we also reject defendant's other contentions that we should overlook his failure to request the instruction and reach the merits. In sum, we conclude defendant failed to preserve his claim of trial court error.

Anticipating the conclusion, defendant argues in his reply brief that trial counsel rendered ineffective assistance in failing to request that the jury be instructed with CALCRIM No. 3426. But defendant should have raised this claim in his opening brief and there is no reason he could not have done so. (*Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 852, fn. 10.) In any event, defendant cannot establish ineffective assistance based on the four corners of the record. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1003.)

Starting from the premise that evidence of voluntary intoxication is relevant to determining whether a defendant formed a specific intent, defendant seems to contend the following charges required specific intent: count five, dissuading a witness (§ 136.1, subd. (b)(1)); count six, criminal threats (§ 422); and count nine, evading an officer in willful disregard (Veh. Code, § 2800.2, subd. (a); see Veh. Code, § 2800.1). Indeed, section 29.4, subdivision (b) allows a jury to consider evidence of voluntary intoxication when deciding whether a defendant formed a required specific intent. But defendant fails to show counsel performed deficiently by not requesting CALCRIM No. 3426 as to the aforementioned charges.

We start with count nine, evading an officer in willful disregard (Veh. Code, § 2800.2, subd. (a)), which requires proof of specific intent to evade a pursuing officer. (Veh. Code, §§ 2800.1 & 2800.2.) During closing argument, defense counsel conceded defendant's guilt as to this count. Considering all

the evidence in this case, counsel could reasonably have chosen, as a tactical matter, to concede guilt as a means of garnering some credibility with the jury in order to muster a more forceful argument as to the attempted willful, deliberate, and premeditated murder charge, which carried far more potential exposure.

Count five, dissuading a witness (§ 136.1, subd. (b)(1)), requires proof of specific intent to prevent or dissuade a victim or witness from reporting victimization. (*People v. Lyons* (1991) 235 Cal.App.3d 1456, 1461.) During closing argument the prosecutor explained this charge concerned defendant's December 2018 threats to V.M. that he would kill her and her family if she were to call the police. Defendant does not acknowledge the prosecutor's election of this theory for count five; nor does he point to any substantial evidence indicating he was intoxicated while making this threat. That the evidence showed defendant drank a large amount of whiskey on the day of the car chase is not evidence that he was intoxicated when making the threats on prior days.

Defendant also states, without citation to the record, that he drank daily, and that his abuse towards V.M. "might not have been completely attributable to his alcohol use, [but] the evidence suggests it was exacerbated when he drank." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 557.) It is unclear what portion of the record defendant is relying on to make this argument. True, V.M. testified that both of them drank wine three to four times per week and that defendant usually drank about the same as or possibly more than she did. By itself, however, this is not substantial evidence that defendant was intoxicated on the occasions when he engaged in dissuading V.M. from reporting him to the police. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

What remains is count six, criminal threats (§ 422), which requires a willful threat "to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . be taken as a threat." (§ 422, subd. (a).) This charge concerned the evidence that defendant threatened to kill V.M. during the car chase. V.M. recounted that defendant refused to let her out of the car while telling her several times she "was going to die right then and there," and he was going to kill her. Considering this against the backdrop of their abusive relationship, counsel could reasonably have decided not to ask for the CALCRIM No. 3426 instruction as to this count. Defendant's words were obviously threats, and it is difficult to see what defendant might possibly have intended in making such statements other than to communicate a threat. Indeed, the totality of the evidence showed that defendant could and did form the requisite intent: he drove at speeds exceeding 100 miles per hour, sometimes with one hand on the steering wheel, while successfully weaving through heavy traffic. He was able to deny V.M.'s pleas to be let out of the car, and to roll up her window whenever she rolled it down out of fear their car would fall into the water. He was also able to maneuver the car so as to nearly run V.M. down.

In sum, defendant has not established ineffective assistance with regard to counsel's failure to request a voluntary intoxication instruction as to the above discussed crimes.

We turn now to defendant's contention that, pursuant to *People v. Reyes* (1997) 52 Cal.App.4th 975 (*Reyes*), CALCRIM No. 3426 should have been given with reference to the following charged offenses having knowledge elements: count four, assault on a peace officer (§ 245, subd. (c)); count eleven, resisting an executive officer (§ 69); and count twelve, resisting and obstructing or delaying a peace officer (§ 148, subd. (a)(1)). As *Reyes*

22

held, evidence of voluntary intoxication is an appropriate consideration if the offense at issue requires a finding of actual knowledge, even if the offense is classified as a general intent crime. (*Reyes*, at pp. 984–986 [receiving stolen property requires " 'the defendant knew the property to be stolen,' " and intoxication is relevant to disproving that element].)[14]  But defendant does not show counsel performed deficiently by not requesting that voluntary intoxication instruction as to these charges.

As to count four, assault on a peace officer, case law specifically recognizes that voluntary intoxication is no defense to such a crime. (*People v. Finney* (1980) 110 Cal.App.3d 705, 712–713 (*Finney*).)  Nor does assault on a peace officer require actual knowledge that the victim is a peace officer; it requires only that the defendant knew, *or reasonably should have known* the person assaulted was a peace officer performing his or her duties. (§ 245, subd. (c), italics added.)  As such, *Reyes* is inapplicable.  Furthermore, where the facts show the defendant " 'reasonably should know' that his victims are police officers," voluntary intoxication does not negate culpability. (*Finney*, at pp. 712–713.)  Here, count four was based on defendant having rammed his car into the CHP vehicle just after V.M. got out.  Defense counsel could reasonably have decided against asking for CALCRIM No. 3426 as to count four given the overwhelming evidence that defendant should have known he was ramming into the vehicle of a peace officer, which was fully marked and had chased him with its lights and sirens on.

---

[14]    There is case law disagreeing with *Reyes*.  (See *People v. Berg* (2018) 23 Cal.App.5th 959, 969–970 [disagreeing with *Reyes* "to the extent it determined that evidence of voluntary intoxication is admissible to cast doubt on the scienter element of a general intent crime"].)  Defendant does not address this.  For the sake of argument, we will set aside this conflict and assume that *Reyes* remains good law.

Similarly, count twelve, resisting, obstructing, delaying a peace officer, requires proof that the defendant " 'knew or reasonably should have known' " the person he was resisting, obstructing, or delaying was a peace officer. (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.) This charge was based on the evidence that defendant fled on foot into the marsh after the car chase and ignored the commands of officers. As above, because actual knowledge is not required for this charge, *Reyes* does not apply.[15] Moreover, we see no reason not to apply the same rule as the one applicable to count four, i.e., that voluntary intoxication will not negate a knowledge element where the facts show the defendant " 'reasonably should know' that his victims are police officers." (*Finney*, *supra*, 110 Cal.App.3d pp. 712–713.) Because the trial evidence overwhelmingly showed that defendant reasonably should have known he was resisting, obstructing, or delaying peace officers when he ran into and remained in the marsh while officers tried to coax him out, we

---

[15] Although defendant does not cite to it, *In re A.L.* (2019) 38 Cal.App.5th 15 construed section 148 subdivision (a)(1) as requiring actual knowledge. (*In re A.L.*, at pp. 22–25; but see *People v. Mackreth* (2020) 58 Cal.App.5th 317, 332–334 [disagreeing with *A.L.*].) But even if voluntary intoxication could have provided a defense to the knowledge element, there is no reasonable probability defendant would have obtained a better outcome as to this charge. There was ample evidence that defendant knew he was resisting, obstructing, or delaying peace officers when he fled into the marsh. Defendant conceded guilt of the Vehicle Code section 2800.2, subdivision (a) count, thereby implicitly acknowledging that he knew he was being chased by peace officers. Defense counsel also seemed to concede guilt as to the section 148, subdivision (a)(1) count, stating, "I suppose if—I mean part of it—part of the resisting I think is that he wouldn't come back out. He was stuck in the mud. If you want to find that he was resisting arrest by running into the mud and getting himself stuck, you're welcome to do that." Defense counsel could reasonably have decided that, based on the record, he could not persuasively argue that defendant was too intoxicated to know he was resisting, obstructing, or delaying peace officers when fleeing into the marsh.

cannot conclude defense counsel was ineffective in failing to request instruction with CALCRIM No. 3426.

Count eleven, resisting an executive officer, was based on defendant's conduct after being apprehended when he was at the hospital and resisted Napa County Deputy Sheriff Ronnie Galindo and Deputy Scott who were in full uniform trying to perform their duties. This charge requires actual knowledge the person being resisted is an executive officer performing his or her duty. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 237.) Here, the evidence showed defendant had just engaged in a high-speed chase with multiple officers and patrol vehicles, and avoided apprehension by staying in the marsh. Defendant conceded guilt of the Vehicle Code section 2800.2, subdivision (a) count, thereby implicitly acknowledging he knew he was being chased by the peace officers. As with count twelve, defense counsel could reasonably have decided to forgo the argument that he was too intoxicated to know he was resisting executive officers lawfully performing their duties at the hospital.

In sum, defendant's failure to establish deficient performance requires rejection of his ineffective assistance of counsel claim.

**F. Unanimity**

Defendant contends the trial court erred in failing to give a unanimity instruction as to which act constituted the basis for the attempted murder charge. We review this claim de novo. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

"[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "The prosecution can make an election by 'tying each specific count to

25

specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) Here, during closing arguments, the prosecutor clearly elected an act that constituted the attempted murder, i.e., defendant's act of trying to run V.M. over after she got out of the car during the chase. We therefore reject this claim.

### G. Cumulative Effect of Errors

Defendant argues the cumulative effect of the claimed errors requires reversal. Because defendant has failed to demonstrate error, we reject the claim.

### H. Sentencing Matters

In supplemental briefing, defendant raises several sentencing issues. First, he argues a remand is necessary because of a recent amendment to section 654. Pursuant to former section 654—which provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment"—the trial court imposed the longer sentence on count one and stayed the shorter sentence on count three, which was based on the same conduct. Effective January 1, 2022, Assembly Bill No. 518 amended section 654 to remove the requirement that the court impose the longest potential term of imprisonment as punishment in cases where there are multiple convictions. (Stats. 2021, ch. 441, § 1.) The People concede a remand is necessary for reconsideration of the court's sentencing discretion on counts one and three, and we agree. Because the change in law is plainly ameliorative within the meaning of *In re Estrada* (1965) 63 Cal.2d 740, it

26

applies retroactively to defendant's case, which is not final.[16] (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308–309.)

Second, defendant contends a remand is necessary because of changes to section 1170 that became effective January 1, 2022.[17] As relevant here, section 1170, subdivision (b), was amended effective January 1, 2022 to require that when a statute specifies three potential terms of imprisonment, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice," the court must impose the lower term when one of the following contributed to the commission of the offense: "(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(1), (6)(A)–(C), as amended by Stats. 2021, ch. 695, § 5.) The People

---

[16] The court also stayed the sentence on count eight, which was based on the same conduct as count seven, and stayed the sentence on count fourteen, which was based on the same conduct as count thirteen. But counts seven and thirteen, which were charges under section 273.5, subdivision (a), carry the same potential three terms as counts eight and fourteen, charges under section 245, subdivisions (a)(1) and (4). (§§ 245, subds. (a)(1) & (4), 273.5, subd. (a).) As such, it appears the amendment to section 654 would not impact the sentencing as to these counts.

[17] Defendant asserts the changes to section 1170 were made by Assembly Bill No. 124 (Stats. 2021, ch. 695, § 6). The People point out that Assembly Bill No. 124 was joined with two other bills—Assembly Bill No. 1540 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 719, § 5), and Senate Bill No. 567 (Stats. 2021, ch. 731, § 3)—that all made changes to section 1170, and Senate Bill No. 567's changes to that statute ultimately prevailed.

concede this change in law is also retroactive under *In re Estrada*, *supra*, 63 Cal.2d 740, and we agree. Because we are remanding this matter for resentencing, defendant may raise this argument with the trial court at that time.

Third, defendant argues the enhancement imposed on him under section 667.5, subdivision (b), must be stricken in light of amendments to that statute by Senate Bill No. 136 (2019–2020 Reg. Sess.) effective January 1, 2020. When defendant was sentenced, former section 667.5, subdivision (b), generally provided for a one-year enhancement for each prior prison term (or jail term imposed under section 1170, subdivision (h)) that a defendant served in the preceding five years. But Senate Bill No. 136 modified section 667.5, subdivision (b), to authorize that enhancement only when the prior prison term is for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) Both parties agree that defendant is entitled to the benefit of the change in the law. We agree insofar as defendant admitted suffering a prior conviction within the meaning of section 667.5, subdivision (b), for first degree residential burglary, not a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). Since we are ordering remand on other sentencing issues, we instruct the trial court to vacate the enhancement.

Last, defendant asks us to remand the matter so the trial court might consider whether to exercise its discretion to strike his prior serious felony conviction under section 667, subdivision (a). We note the trial court had this discretion at defendant's sentencing. (§ 1385, as amended by Stats. 2018, ch. 1013, § 2.) But since we are remanding this matter for resentencing, defendant may raise this argument with the trial court at that time.

## DISPOSITION

The matter is remanded for resentencing, so that the trial court may reconsider its sentencing choices in light of the recent changes to section 654 and section 1170. We express no opinion as to what sentence should be imposed on remand. The court, however, is instructed to vacate the enhancement under section 667.5, subdivision (b). In all other respects, the judgment is affirmed.

                                                          _____
                                                          Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Petrou, J.


A158498/*People v. Branks*

30